**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

     Plaintiff,

  v.

U.S. DEPARTMENT OF
JUSTICE,

     Defendant.

Civil Action No. 23-cv-262 (JEB)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
<u>PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………………...i

TABLE OF AUTHORITIES……………………………………………………….......iii

INTRODUCTION………………………………………………………………………1

BACKGROUND…………………………………………………………………….....2

ARGUMENT……………………………………………………………………………5

    I.     Legal Standards…………………………………………………………..5

    II.    Defendant Has Failed to Provide Admissible Evidence Supporting Its Exemption Claims……………………………………………………………6

    III.   Defendant Has Not Met Its Burden of Showing Its Withholdings Under Exemption 5 Are Proper………………………………………………………10

    A.    Deliberative Process Privilege……………………………………………...10

        1.    Defendant has failed to show that the records are "predecesional"……..11

        2.    Defendant has failed to show that the records are deliberative………….20

    B.    Attorney Work-Product Doctrine……………………………………………..24

    IV.   Defendant Has Failed to Show Foreseeable Harm From the Disclosure of the Withheld Records……………………………………………………………26

    V.    Defendant Has Failed to Meet Its Burden to Demonstrate That It Properly Invoked Exemption 7……………………………………………………………29

    A.    Defendant Has Failed to Show That It Properly Relied on Exemption 7(A)……29

        1.    DOJ failed to demonstrate there is a pending law enforcement proceeding………………………………………………………………29

        2.    DOJ failed to demonstrate the disclosure of the requested records would interfere with a pending law enforcement proceeding…………..32

i

    B.    Defendant Has Failed to Show That It Properly Relied on Exemption 7(C)......33

    VI.    Defendant Has Failed to Demonstrate It Produced All Reasonably
           Segregable Material…………………………………………………………..36

CONCLUSION……………………………………………………………………..…37

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Fed. Bureau of Prisons*, Civil Action No. 20-2320 (RBW), 2022 U.S. Dist. LEXIS 77491 (D.D.C. Apr. 28, 2022) ............................................................................... 7,8

*Aepa Architects Eng'rs v. Aziz*, No. 1:21-cv-01457 (TNM), 2023 U.S. Dist. LEXIS 234504, (D.D.C. Dec. 15, 2023) .............................................................................................. 6

*Animal Legal Defense Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295 (D.D.C. 1999).. 36,37

*Anthony v. FBI*, No. 1:22-cv-01558 (TNM), 2024 U.S. Dist. LEXIS 24704 (D.D.C. Feb. 13, 2024)………………………………………………………………………………..6

*Buzzfeed, Inc. v. FBI*, 613 F. Supp. 3d 453 (D.D.C. 2020 ......................................................... 8,9

*Campbell v. Dep't of Health & Hum. Serv*s., 682 F.2d 256 (D.C. Cir. 1982). ............................ 32

*Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 677 F. Supp. 2d 101 (D.D.C. 2009) ............................................................................................................. 10

*Climate Investigations Ctr. v.U.S. Dep't of Energy*, No. 16-cv-124 (APM), 2017 U.S. Dist. LEXIS 146246 (D.D.C. Sep. 11, 2017) .................................................................. 20

*CREW v. U.S. Dep't of Justice*, 746 F.3d 1082 (D.C. Cir. 2014).................................................. 34

*CREW v. USPS*, 557 F. Supp. 3d 145 (D.D.C. 2021)…………………………………………17

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)..................... passim

*Ctr. for Investigative Reporting v. Dep't of the Interior*, No. 18-1599, 2020 WL 1695175 (D.D.C. Apr. 7, 2020)………………………………………………………………….27

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90 (D.D.C. 2019) ................................................................................................ 6, 27, 33

*Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001)........................... 10

*Director, Office of Thrift Supervision v. Vinson & Elkins*, 124 F.3d 1304 (D.C. Cir. 1997) ....... 24

*DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749 (1989)................................................. 1

*Elec. Frontier Found. v.U.S. Dep't of Justice*, 739 F.3d 1 (D.C. Cir. 2014) ................................ 27

*Elec. Privacy Info. Ctr. v. Customs & Border Prot.*, 248 F. Supp. 3d 12 (D.D.C. 2017)............ 22

*Fleck v. VA Office of the Inspector Gen.*, 651 F. Supp. 3d 46 (D.D.C. 2023) ................................ 9

*FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142 (D.C. Cir. 2015) ............................ 24

*Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1978)................................................................................ 5

*Gray v. U.S. Army Crim. Investigation Command*, 742 F. Supp. 2d 68 (D.D.C. 2010)......... 30, 36

*Greenspan v. Bd. of Governors of the Fed. Reserve Sys.*, 643 F. Supp. 3d 176 (D.D.C. 2022)... 10

*Hainey v. U.S. Dep't of Interior*, 925 F. Supp. 2d 34 (D.D.C. 2013 ........................................ 9, 15

*Harris v. Gonzales*, 488 F.3d 442 (D.C. Cir. 2007)........................................................................ 8

*Houser v. Church*, 486 F. Supp. 3d 117 (D.D.C. 2020) ................................................................ 35

*In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007 (1st Cir. 1998) ............... 24, 26, 27

*Inst. for Policy Studies v. CIA*, 885 F. Supp. 2d 120 (D.D.C. 2012) ............................................ 6

*Judicial Watch, Inc. v. FDA*, 449 F. 3d 141 (D.C. Cir. 2006)…………………………………..29

*Judicial Watch, Inc. v. U.S. Dep't of Justice, 20 F.4th 49 (D.C. Cir. 2021* ......................... passim

*Judicial Watch, Inc. v. U.S. Dep't of Justice*, 391 F. Supp. 3d 43 (D.D.C. 2019)................. 21, 25

*Judicial Watch, Inc. v. DOJ*, No. 17-0916, 2019 WL 3859002 (D.D.C. Aug. 16, 2019)............ 27

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, No. 17-cv-1283, 2020 WL 6939807 (D.D.C. Nov. 25, 2020)................................................................................................................ 5

*King v. DOJ*, 830 F.2d 210 (D.C. Cir. 1987)................................................................................ 5

*Londrigan v. FBI*, 670 F.2d 1164 (D.C. Cir. 1982) ...................................................................... 7

*Mapother v. Dep't of Justice*, 3 F.3d 1533, (D.C.Cir. 1993)........................................................ 30

*McKinley v. Fed. Hous. Fin. Agency*, 789 F. Supp. 2d 85, (D.D.C. 2011)...................................... 5

*Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242 (D.C. Cir. 1977))………………………………………………………………………………………..36

*Miller v. U.S. Dep't of Justice*, 872 F. Supp. 2d 12 (D.D.C. 2012) .................................... 6, 30, 32

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ......................................... 11, 17, 21, 29

*Multi Ag Media LLC v. USDA*, 515 F.3d 1224 (D.C. Cir. 2008)…………………………………5

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002).......................... 5

*Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992) ............................................................... 9

*N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978).................................... 32

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)................................................ 11

*Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983)........................................................... 11

*Perry-Torres v. United States Dep't of State*, 404 F. Supp. 2d 140 (D.D.C. 2005).............. 36, 37

*Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992) ...................... 19

*Potter v. District of Columbia*, 558 F.3d 542 (D.C. Cir. 2009) .................................... 20

*Project on Gov't Oversight, Inc. v. U.S. Dep't of Homeland Sec.*, 657 F. Supp. 3d 50 (D.D.C. 2023) ..................................................................................................... 18-19

*Prop. of People v. U.S. Dep't of Justice*, 405 F. Supp. 3d 99 (D.D.C. 2019 ............................ 8, 9

*Pub. Citizen, Inc. v. OMB*, 598 F.3d 865 (D.C. Cir. 2009).................................... 22, 28

*Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021)............... passim

*Roth v. U.S. Dep't of Justice*, 642 F.3d 1161 (D.C. Cir. 2011) .................................. 36

*SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197 (D.C. Cir. 1991) ...................... 8, 30, 31

*Senate of P.R. ex rel. Judiciary Comm. v. U.S. DOJ*, 823 F.2d 574 (1987) .......................... 13, 24

*Soghoian v. U.S. Dep't of Justice*, 885 F. Supp. 2d 62 (D.D.C. 2012)......................... 10

*Stern v. FBI*, 737 F.2d 84 (D.C. Cir. 1984)................................................................... 5

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ........................ 30, 32

*Tax Analysts v. IRS.*, 294 F.3d 71 (D.C. Cir. 2002)..................................................... 30

*Touarsi v. United States DOJ*, 78 F. Supp. 3d 332 (D.D.C. 2015).................................................. 37

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021).................. passim

*United States v. Nobles*, 422 U.S. 225 (1975) ............................................................. 25

*U.S. Dep't of Justice v. Reporters Committee*, 489 U.S. 749 (1989)………………………….40

*Valfells v. CIA*, 717 F. Supp. 2d 110 (D.D.C. 2010)………………………………………….36

*Waterman v. IRS*, 61 F.4th 152 (D.C. Cir. 2023).......................................................... 24

*Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1 (D.D.C. 2004)…………………...36

*Zander v. U.S. Dep't of Justice*, 885 F. Supp. 2d 1 (D.D.C. 2012) ............................................. 25

**Statutes**

5 U.S.C. § 552(a)(4)(B................................................................................................... 6

5 U.S.C. § 552(a)(8)(A)(i). ............................................................................................ 6

5 U.S.C. § 552(b)(5) ............................................................................................... passim

28 U.S.C. § 1746 ……………………………………………………………………………….9

**Other Authorities**

H.R. Rep. No. 391................................................................................................... 27

S. Rep. No. 4......................................................................................................... 27

## <u>INTRODUCTION</u>

Now more than ever, threats to the integrity of our elections and the fundamental right to vote are matters of urgent public importance. Understanding how the U.S. Department of Justice ("DOJ") has dealt with such threats in recent elections directly advances the public's interest in knowing "what their government is up to." *DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 772–773 (1989). That is what this Freedom of Information Act ("FOIA") case is about. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks records related to DOJ's response to several states barring federal election monitors from polling sites in the 2022 midterm elections.

DOJ has now moved for summary judgment claiming some of the responsive records are protected from disclosure pursuant to FOIA Exemptions 5, 7(A), and 7(C). In support of that motion DOJ has proffered a two-page declaration completely lacking factual support for its claimed exemptions. DOJ relies instead on the unsworn *Vaughn* index prepared by an unidentified person or persons of unknown expertise. These submissions fall far short of meeting the evidentiary burden that DOJ bears.

Specifically, DOJ has failed to show that its withholdings consist of pre-decisional and deliberative material and therefore are protected by the deliberative process privilege incorporated in Exemption 5. Similarly, DOJ has not satisfied the prerequisites to withhold documents under the attorney work-product doctrine. DOJ's exemption claims under 7(A) and 7(C) also fail because DOJ has not demonstrated that there is a pending investigation with which the release of records would interfere, and it has failed to properly balance the significant public interest in disclosure against the private interest in withholding.

## BACKGROUND

DOJ's Civil Rights Division and its Voting Rights Section enforce federal laws protecting the right to vote. U.S. Department of Justice, Civil Rights Division, https://www.justice.gov/crt/voting-section. Beginning with the passage of the Voting Rights Act of 1965, the Civil Rights Division "has regularly monitored elections in the field in jurisdictions around the country to protect the rights of voters." *Justice Department to Monitor Polls in 24 States for Compliance with Federal Voting Rights Laws*, U.S. Department of Justice Office of Public Affairs (Nov. 7, 2022), https://www.justice.gov/opa/pr/justice-department-monitor-polls-24-states-compliance-federal-voting-rights-laws (last visited March 24, 2024). As part of that effort DOJ announced plans on November 7, 2022, to place personnel in 24 states and 64 jurisdictions, including Florida and Missouri, to monitor Election Day and early voting in the November 8, 2022 midterm election. *Id.*

Eric S. Dreiband, assistant attorney general for the Civil Rights Division, described this work as "a continuation of [his office's] historical mission to ensure that all of our citizens can freely exercise this most fundamental American right." Spectrum News Staff & Rebecca Turco, *Justice Department Sending Election Monitors to Orange, Hillsborough Counties*, Spectrum News (Nov. 3, 2020), https://mynews13.com/fl/orlando/news/2020/11/02/justice-department-sending-election-monitors-to-orange--hillsborough (last visited March 24, 2024). Mr. Dreiband further explained the purpose of the federal voting laws as protecting "the right of all American citizens to vote without suffering discrimination, intimidation, and harassment." *Id.* Nevertheless, the Secretaries of State of Florida and Missouri rejected DOJ's plan to place election monitors inside polling stations during the election, Patricia Mazzei & Glenn Thrush, *Florida's secretary of state is blocking federal monitors from entering polling sites*, N.Y. Times (Nov. 8, 2022), https://www.nytimes.com/2022/11/08/us/politics/florida-federal-voting-

2

monitors.html (last visited March 24, 2024), a typical practice to ensure compliance with federal

voting laws. Spectrum News, *supra*.

To shed light on how DOJ responded to the states' resistance to federal election oversight

and DOJ's policies and procedures for deploying election monitors where states have objected to

such deployments, CREW submitted a FOIA request to DOJ's Civil Rights Division on

November 9, 2022. Compl. Ex. 1, at 8, ECF No. 1. CREW's FOIA request, attached to the

Complaint as Exhibit 1, sought the following records from January 1, 2022 to the date its request

was processed:

- All records relating to the deployment of DOJ personnel to monitor elections in Florida, including but not limited to any responsive communications with Florida state, county, or local officials.
- All records relating to the deployment of DOJ personnel to monitor elections in Missouri, including but not limited to any responsive communications with Missouri state, county, or local officials.
- All records relating to the deployment of DOJ personnel to monitor elections in any state (other than Florida and Missouri) that declined to authorize or otherwise objected to the presence of DOJ election monitors at or near polling places, including but not limited to any responsive communications with state, county, or local officials.
- All DOJ policies, procedures, guidance, memoranda, or similar records concerning the deployment of DOJ election monitors to polling places where state, county, or local officials decline to authorize or otherwise object to the presence of DOJ election monitors at or near polling places. Compl., Ex. 1.

In a response letter dated November 18, 2022, DOJ acknowledged receiving CREW's

request on November 9, 2022, and assigned the request the tracking number 23-00036-F. Compl.

at ¶ 3. Over two months later, having received no further communication or any documents in

response to its request, CREW filed its complaint on January 30, 2023. *See* ECF No. 1.

The Court ordered the parties to meet and decide on a production schedule. Joint Status

Report ("JSR"), April 19, 2023, ECF No. 9. DOJ identified responsive records in the custody of

two sections of the Civil Rights Division: the Voting Rights Section and the Disability Rights

Section. *Id.* Defendant made four total productions of responsive material. The first on May 31, 2023, consisted of 29 pages of responsive documents from the Disability Rights Section. JSR, June 2, 2023, ECF No. 10. The second production on June 21, 2023, consisted of 79 pages of responsive records from the Voting Rights Section. JSR, July 5, 2023, ECF No. 11. In its third production on July 20, 2023, DOJ produced 53 pages of responsive documents from the Disability Rights Section. JSR, Aug. 2, 2023, ECF No. 12. In its fourth and final production on August 30, 2023, DOJ produced 126 pages of responsive documents. JSR, Sept. 5, 2023, ECF No. 13. DOJ failed to identify which section of the Civil Rights Division (Voting Rights or Disability Rights) provided the records for the August 30, 2023 production. *Id.* Throughout these four productions, DOJ redacted portions or nearly entire pages, citing FOIA Exemptions 5, 6, 7(A), and 7(C).

CREW challenges the redactions made in the May 31, 2023 production ("May Production"), consisting primarily of 29 pages of weekly reports and internal communications that were redacted under FOIA Exemptions 5, 6 and 7(A). Of the 29 pages, 16 are partially redacted, and 13 have sections so largely redacted that no meaningful text remains. CREW also challenges the August 30, 2023 production ("August Production"), consisting of 126 pages of emails and memos from DOJ personnel. DOJ withheld 35 pages in their entirety, and in the other 91 pages, DOJ redacted vast swaths that make the documents indecipherable. CREW challenges the withholdings made pursuant to Exemptions 5, 7(A), and 7(C) in both productions.

DOJ has now moved for summary judgment, claiming it has fully produced all responsive documents, and properly invoked Exemptions 5 and 7. In support DOJ relies on conclusory statements unsupported by competent evidence in the record.

## ARGUMENT

### I.    Legal Standards

Congress enacted FOIA to "open up the workings of government to public scrutiny through the disclosure of government records." *Stern v. FBI*, 737 F.2d 84, 88 (D.C. Cir. 1984). "At all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure,' and that the statutory exemptions, which are exclusive, are to be 'narrowly construed.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002).

Courts usually decide FOIA cases on motions for summary judgment. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, No. 17-cv-1283, 2020 WL 6939807, at *2 (D.D.C. Nov. 25, 2020) (internal citations omitted). When a court reviews a FOIA summary judgment motion, it must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). Summary judgment shall be granted "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To obtain summary judgement, an agency has the burden of proving that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements.'" *McKinley v. Fed. Hous. Fin. Agency*, 789 F. Supp. 2d 85, 87 (D.D.C. 2011) (*citing Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)). The agency must "disclos[e] as much information as possible without thwarting the exemption's purpose," *King v. DOJ*, 830 F.2d 210, 224 (D.C. Cir. 1987), and can obtain summary judgment only if its submissions "contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1227 (D.C. Cir. 2008). The agency still bears the burden of proof "even when the requester files a cross-motion for summary judgment, because the Government ultimately [has] the onus of

5

proving that the [documents] are exempt from disclosure, while the burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 99 (D.D.C. 2019) (internal quotations omitted).

For any document withheld as exempt, the agency must separately satisfy the "foreseeable harm" standard of the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538. *See* 5 U.S.C. § 552(a)(8)(A)(i). Under those amendments, "the government may not withhold even … privileged materials unless it also 'reasonably foresees that disclosure would harm an interest protected by' the FOIA exemption." *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).

As relief for improper withholdings "FOIA authorizes federal courts to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.* at 98; 5 U.S.C. § 552(a)(4)(B) (internal quotations omitted).

## II.    Defendant Has Failed to Provide Admissible Evidence Supporting Its Exemption Claims.

In the FOIA context, "an agency may be entitled to summary judgment  . . . if it demonstrates that no material facts are in dispute." *Miller v. U.S. Dep't of Justice*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012). To support its motion for summary judgment a defendant must "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *Aepa Architects Eng'rs v. Aziz*, No. 1:21-cv-01457 (TNM), 2023 U.S. Dist. LEXIS 234504, at *15 (D.D.C. Dec. 15, 2023). To obtain summary judgment in a FOIA case, the government must, however, provide admissible evidence. Fed. R. Civ. P. 56(e); *see Inst. for Policy Studies v. CIA*, 885 F. Supp. 2d 120, 134 (D.D.C. 2012) (requiring agency declarant to show personal knowledge); *Anthony v. FBI*, No. 1:22-cv-01558 (TNM), 2024 U.S. Dist. LEXIS 24704, at *5 (D.D.C. Feb. 13, 2024)

6

("FOIA cases live or die by the agency's declarations"). A movant may rely on reasonably detailed and non-conclusory declarations, *id.* but they must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Even in the FOIA context, "the requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented." *ACLU v. Fed. Bureau of Prisons*, Civil Action No. 20-2320 (RBW), 2022 U.S. Dist. LEXIS 77491, at *5 (D.D.C. Apr. 28, 2022) (citing *Londrigan v. FBI*, 670 F.2d 1164, 1174, (D.C. Cir. 1982)).

Here Defendant relies on two documents to support its Motion: the Declaration of Robert S. Berman ("Berman Decl.") and its *Vaughn* index.[1] Neither document satisfies the requirements of Rule 56(c)(4).

Defendant's affiant Robert Berman is the Deputy Chief of the Voting Rights Section of the Civil Rights Division of DOJ. Berman Decl. ¶ 1. In his declaration he admits that he has only viewed records that originated in the Voting Rights Section. *Id.* ¶ 2. The responsive records at issue, however, originated in both the Voting Rights Section and the Disability Rights Section. Mem. of Pts. and Auths. in Support of Def.'s M. for SJ ("Def. Mem.") at 3. Thus, Mr. Berman by his own admission did not review most of the records withheld.[2] An affidavit must be "made

---

[1] Defendant also submitted a declaration from Kilian Kagle, Chief of the CRT FOIA Unit (the "Kagle Decl."), however, it only concerns Defendant's search, and provides no information on its invocation of exemptions.

[2] The May Production consists of documents entirely from the Disability Rights Section. Exhibit A. As for the August Production, the FOIA production letter only states that the production consists of documents from Voting Rights and the Disability Rights Sections. However, in email communications, Defendant has stated that "[o]f the 126 pages released, 75 are from DRS and 51 are from Voting Rights Section," but failed to specify where each specific record originated. Accordingly, it appears that 104 (75+29) out of the 155 total pages (or 67%) are from the Disability Rights Section.

on personal knowledge" and "show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. Pr. 56(c)(4); *see ACLU,* 2022 U.S. Dist. LEXIS 77491, at *5*. Mr. Berman's lack of person knowledge makes him not competent to testify as to the records from the Disability Rights Section. *See* Fed. R. Civ. P. 56(c)(4); *Prop. of People v. U.S. Dep't of Justice*, 405 F. Supp. 3d 99, 126 (D.D.C. 2019) (citing *Harris v. Gonzales*, 488 F.3d 442, 446 (D.C. Cir. 2007)) (explaining that an agency declaration is inadequate when it was unclear whether the affiant has actually looked at the documents).

Indeed, Mr. Berman has provided no basis for any knowledge of the Disability Rights Section records much less insight into the implications of their disclosure. Under comparable circumstances courts have concluded that the proffered declarant is not competent to testify. *See Buzzfeed, Inc. v. FBI*, 613 F. Supp. 3d 453, 468 n.5 (D.D.C. 2020) (citing *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)) (agency declarant is not competent if they have not "personally been advised about or reviewed those records"). As a result, because the May Production consists solely of records from the Disability Rights Section, Exhibit A, the Berman Declaration provides no evidentiary basis for withholding these records. Fed. R. Civ. Pr. 56(c)(4); *Prop. of People*, 405 F. Supp. 3d at 126; *Buzzfeed*, 613 F. Supp. 3d at 468 n.5.

The August Production contains records from both the Disability Rights Section and the Voting Rights Section. *See* Exhibit B (attached hereto). Most of the records appear to relate to an Americans with Disability Act ("ADA") Title II investigation in which Mr. Berman had no participation. Berman Decl. ¶ 2 (stating only that he has "shared initial supervisory authority over enforcement of the Voting Rights Act"). Moreover, Defendant has not specified which documents originated from which section. But what is clear from the Berman Declaration is that he did not review any records that originated in the Disability Rights Section, has no personal

knowledge of them, and is not competent to testify regarding them. Fed. R. Civ. Pr. 56(c)(4); *Prop. of People*, 405 F. Supp. 3d at 126; *Buzzfeed*, 613 F. Supp. 3d at 468 n.5.

Defendant also relies on the *Vaughn* index. But unlike the declaration, Defendant has not specified who authored the *Vaughn* index, whether they have personal knowledge, the basis for that knowledge, or whether they are competent to testify on the redactions in the records. The Berman Declaration is silent on who drafted the index and how they conducted their work. Nor does the Declaration adopt the index and its authenticity and veracity by reference. The *Vaughn* index thus is an unsworn statement, not made under oath pursuant to 28 U.S.C. § 1746 and lacks any evidence of the competence of its author to testify. While *Vaughn* indexes typically are not sworn and their authors often are not identified, they can be used if sufficiently verified by a sworn agency declaration. Here, the agency has provided no such declaration. Accordingly, it cannot qualify as competent evidence supporting Defendant's motion. *See Hainey v. U.S. Dep't of Interior*, 925 F. Supp. 2d 34, 41 (D.D.C. 2013) ("In the FOIA context, a declarant satisfies the personal knowledge requirement of Federal Rule of Civil Procedure 56(e) if, 'in his declaration, [he] attest[s] to his personal knowledge of the procedures used in handling [a FOIA] request and his familiarity with the documents in question.'"); *cf. Fleck v. VA Office of the Inspector Gen.*, 651 F. Supp. 3d 46, 54 (D.D.C. 2023) (citing *Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992)) (holding that an unverified complaint cannot substitute for an affidavit under Rule 56(c)(4), similarly, an unverified *Vaughn* index cannot substitute for an affidavit).

Moreover, while Mr. Berman may be competent to testify regarding records originating from the Voting Rights Section, he has not even adopted the index and its authenticity and veracity by reference or provided evidentiary support for any of the exemptions it claims. Accordingly, Defendant's Motion must be denied as lacking any evidentiary support.

### III.    Defendant Has Not Met Its Burden of Showing Its Withholdings Under Exemption 5 Are Proper.

Exemption 5 of FOIA allows agencies to withhold records when the requested documents include "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). In determining whether a document was properly withheld under Exemption 5, a court must ensure that the document satisfies two conditions: (1) "its source must be a Government agency", and (2) "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). These privileges include the deliberative process privilege and attorney work-product doctrine on which Defendant relies here. Defendant has failed to carry its burden for demonstrating the applicability of both Exemption 5 privileges.

### A.  Deliberative Process Privilege.

An agency asserting the deliberative process privilege must show that the withheld document is both "[p]re-decisional" and "deliberative." *Soghoian v. U.S. Dep't of Justice*, 885 F. Supp. 2d 62, 73-74 (D.D.C. 2012). A document is pre-decisional if it is "[a]ntecedent to the adoption of an agency policy[,]" *id.*, and deliberative if it "makes recommendations or expresses opinions on legal or policy matters." *Id.* The deliberative process privilege only "shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021); *Greenspan v. Bd. of Governors of the Fed. Reserve Sys.*, 643 F. Supp. 3d 176, 189 (D.D.C. 2022). Moreover, it does not "shield information that the agency fails to place within a particular decisionmaking context." *Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 677 F. Supp. 2d 101, 107-08 (D.D.C. 2009). Further, an agency must also show that release of

the withheld documents would foreseeably harm an interest protected by Exemption 5. *See Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021).

### 1. Defendant has failed to show that the records are "predecisional."

A document is predecisional if it was "generated before the adoption of an agency policy." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). In determining whether this prerequisite has been met a reviewing court "must consider whether the agency treats the document as its final view on the matter." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 20 F.4th 49, 54 (D.C. Cir. 2021). "[T]o ascertain whether the documents at issue are pre-decisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed." *See Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (citing *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983)). Further, there is a distinction between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152 (1975). The deliberative process privilege only "shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *Sierra Club, Inc.*, 141 S. Ct. at 785.

Here, Defendant has failed to show that the withheld records were created prior to an agency decision or that they do not reflect the agency's final decision.

*May Production Emails*

The May Production consists of email communications between Civil Rights Division attorneys, and several Weekly Status Reports ("WSRs") from Civil Rights Division attorneys to Deputy Assistant Attorney General Jennifer Mathis. With respect to the email communications, the Berman Declaration fails to identify any final agency decision to which they pertain. Instead,

Mr. Berman states only that "these records also reflect numerous predecisional discussions among CRT attorneys that are protected by Exemption 5." Berman Decl. ¶ 5. But he is silent on the nature of those discussions and to what, if any, final decisions they pertain. Of course, as discussed above, Mr. Berman is not competent to speak to any of the documents from the Disability Rights Section.

The *Vaughn* index also fails to pinpoint a decision to which these email communications relate, stating only that the redactions "consist of a pre-decisional list of potential staff, including which component they would come from, assigned to monitor elections." *See Vaughn* index at 3–4[3]; *see also id.* at 4.[4] And while the *Vaughn* index refers generally to decisions, it is far from clear what those decisions are and how the redactions pertain to them. For example, in some places, the *Vaughn* index merely references anticipated "poll monitoring plans," a generic description that provides no detail on the nature of those plans. *See, e.g., Vaughn* index at 12 ("Redactions consist of anticipated poll monitoring plans within the states"); *see also id.* at 3-5, 12.[5] In other places the *Vaughn* index refers to discussions relating to "responses" to anticipated "issues," but provides nothing about what type of decisions DOJ is considering, such as whether the anticipated "issues" relate to legal actions, travel accommodations, or something else entirely. *See Vaughn* index at 3, 5, 12-13.

In an apparent effort to fill in this gap, Defendant's Memorandum claims that "[t]his material is predecisional because it preceded DOJ's ultimate decision of which elections monitors to send to which polling sites." Def. Mem. at 11. However, Defendant fails to cite to any factual support for this assertion in either the *Vaughn* index or the Berman Declaration. *See*

---

[3] May Production pgs. 11, 25, 26
[4] *Id.* pg. 28.
[5] May Production pgs. 18, 25-26, 28. August Production pgs. 3, 104-05.

*id.*[6] The unsupported assertions of DOJ's counsel cannot substitute for the admissible evidence DOJ must provide to support its Exemption 5 claims.

DOJ is equally silent on when this "ultimate" decision took place, *see* Def. Mem. at 11, a necessary fact in establishing the applicability of the deliberative process privilege. As the D.C. Circuit has explained, "[a] document is predecisional if it precedes, in temporal sequence, the decision to which it relates." To evaluate a claim of deliberative process privilege, therefore, "a court must be able to pinpoint an agency decision or policy to which the document contributed." *Senate of P.R. ex rel. Judiciary Comm. v. United States DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987) (internal quotations omitted). DOJ has not pinpointed that decision here. It is fair to presume, however, that it made the decision on which election monitors to send and where to send them prior to issuing the Press Release on November 7, 2022, which announced DOJ was sending election monitors to 64 different jurisdictions across 24 states. *See* DOJ Office of Public Affairs, *supra*.

The documents in fact demonstrate that decisions were in fact made earlier. Emails DOJ produced reflect DOJ numerous decisions DOJ made prior to issuing the press release. For example, one email chain, dated November 7, 2022, at 12:50 a.m., states "Below are our current assignments for monitoring in Minnesota on Tuesday." August Production at 106. Thus, by that time the listed polling assignments for that state were set, reflecting a final decision. Likewise, the *Vaughn* index explains, "Redactions consist of a list of poll monitors, including which component they are with, *planned* for two counties in the state," *Vaughn* index at 12 (emphasis added), again conveying a decision already finalized. For another email chain, dated 10/31/22-

---

[6] This failure to cite to evidentiary support is understandable, as both the *Vaughn* index and the Berman Declaration fail to identify a single specific decision.

11/1/2022, the *Vaughn* index states, "Redactions consist of the names of poll monitors, including which component they are coming from, and polling location in NC." *Vaughn* index at 13. This language indicates DOJ made multiple logistical decisions, but it is impossible to determine from either the *Vaughn* index or the Berman Declaration when the decision or decisions took place and to which decision or decisions the claimed pre-decisional documents relate.

The language of several of the emails redacted on grounds of deliberative process also indicates they were communicating final decisions already made. Such e-mails use the word "will," textual proof of a final agency decision. For example, one email dated October 26, 2022, states that for some of the polling locations, "the following counties *will have* DRS[7] and USAO[8] personnel conducting investigations." May Production, ECF No. 20-5 at 11 (emphasis added). In contrast, other emails state that they are "unsure" about other polling locations. Compare *id.* at 11 ("we are unsure yet if we will be in…") with *id.* at 25 ("will be doing"). One communication, made on Wednesday, October 26, 2022, indicates that DOJ will confirm polling locations "later this week," which at the latest would fall on Saturday, October 29, 2022, over a week before the Press Release. *Id.* at 11.

Another example is an email sent on October 26, 2022, twelve days before the November 7 Press Release, by Elizabeth Johnson stating, "[t]he following counties *will* have DRS and USAO personnel conducting investigations in: Center [sic] County, PA [redacted] on Election Day…Los Angeles County, CA [redacted] during early voting (there may be [redacted])…Sitka City-Borough, AK [redacted] during early voting." *Id.* at 11 (emphasis added). The use of the word "will" indicates a decision already has been made to send personnel to the listed

---

[7] Disability Rights Section.
[8] United States Attorneys' Office.

jurisdictions. By contrast, the email continues that "[they] are unsure yet if we will be in" Newton County and Kansas City. *Id.*

Another email sent on the same day adds "we *will* have [redacted] people in Harris County [redacted]." (emphasis added) On November 1, 2022, only six days before the November 7 Press Release, Elizabeth Johnson sent an email with "updates to [their] election monitoring in bold." The email lists Centre County, Los Angeles County, Sitka City-Borough, and Harris County, but not in bold. By contrast, Newton County, Cole County, Lexington County, and Spartan County are in bold, indicating updates. *Id.* at 26.

Similarly, on November 2, 2022, only five days before the November 7 Press Release, Elizabeth Westfall, Deputy Chief of the Disability Rights Section, sent an email "provid[ing]…a list of jurisdictions in which the DRS and USAOs *will* be doing ADA monitoring during early voting or on Election Day." (emphasis added). The same list was provided to the Voting Section. *See Id.* at 25. The list includes: "Center [sic] County, PA [redacted] on Election Day…Los Angeles County, CA [redacted] during early voting…Sitka City-Borough, AK [redacted] during early voting." Additionally, it also lists: "Harris County, TX [redacted]…Newton County, AR [redacted] on Election Day…Cole County, MO [redacted] during in person absentee and on Election Day…Lexington County, SC [redacted] on Election Day…Spartanburg County, SC [redacted] on Election Day." The deployment of employees to Centre County, Los Angeles County, Sitka City-Borough, and Harris County remained the same. Further, the list of Newton County, Cole County, Lexington County, and Spartan County tracks the November 1, 2022 email. While in the October 26, 2022 email, the decision to deploy to Newton County was not

yet made, in the November 2, 2022 email the decision had been made. Compare *id.* at 11 ("we are unsure yet if we will be in") *with id.* at 25 ("will be doing").[9]

On November 7, 2022, the day of the Press Release, Elizabeth Westfall sent an email, asking if the following was accurate for use in the DAAG Weekly: "Disability Rights Section staff and U.S. Attorney's Offices will conduct ADA monitoring during Election Day in the following jurisdictions: Center [sic] County, PA; Harris County, TX; Newton County, AR; Cole County, MO; Lexington County, SC; Spartanburg County, SC." Elizabeth Johnson responded shortly thereafter, "Los Angeles County, too" *id.* at 28, thereby confirming the accuracy of the prior list of places where DOJ already had determined to send monitors. This email was sent no earlier than 3:27 p.m., but news organizations had already reported on the Press Release in the morning. *See* Paul Pearson, *Federal Election Monitors to Observe Voting in Nevada*, Las Vegas Review-Journal (Nov. 7, 2022) https://www.reviewjournal.com/news/politics-and-government/clark-county/federal-election-monitors-to-observe-voting-in-nevada-2671832/ (reporting at 10:47 a.m.).

The logistics of mobilizing dozens of DOJ personnel to travel to 64 jurisdictions across 24 states make it likely that decisions were made far earlier that November 7, 2022. Dispatching many monitors to many states is a serious undertaking, requiring a rolling set of logistical decisions. The Press Statement DOJ issued on that day states that the Civil Rights Division would be sending monitors to "64 jurisdictions in 24 states." *See* DOJ Office of Public Affairs, *supra*. If the Civil Rights Division only sent one monitor per jurisdiction, it would still need to arrange 64 separate airplane tickets, 64 overnight accommodations, etc. It seems highly unlikely

---

[9] In its *Vaughn* index, Defendant claims that by November 3, 2022, there was "no decision made yet on which places to visit on the upcoming election day." *Vaughn* index at 5. However, as the preceding emails show, that claim is inaccurate.

that the Civil Rights Division waited until Election Day to make these travel arrangements. This indicates that DOJ made dozens of logistical decisions as part of this large effort. As a result, any passage relating to any deployment already decided upon cannot be subject to the deliberative process privilege.  It is incumbent on the Defendant to make this decision-by-decision analysis but it failed to do so.

Nor may DOJ satisfy Exemption 5 by defining the final "decision" at issue in nebulous terms to encompass a "litany of subsidiary decisions," as that would "effectively shield[] all agency action from review without accounting for any subsidiary agency decisions' and 'undermine the integrity of the FOIA process as a means of ensuring government accountability.'" *CREW v. USPS*, 557 F. Supp. 3d 145, 157 (D.D.C. 2021).

Additionally, the Defendant's purported decision seems very narrow—only "who" to send "where," but not "when," "how" or "why" to send them. Redactions related to discussions on when to send monitors, how to send them, or why to send them, would not be predecisional to the decision of who to send where. Accordingly, this narrows the potential application of the deliberative process privilege to only discussions predating the "who" and "where" decisions, excluding from the privilege's reach any discussions pertaining to decisions on "what," "when," "how," or "why."

In sum, for multiple reasons Defendant has failed to meet its burden of showing that these records are predecisional. *See Morley*, 508 F.3d at 1127; *Miller*, 872 F. Supp. 2d at 18. It is not enough for the government, even had it offered competent evidence, to assert generally that the e-mails were pre-decisional.  Instead, it must show that each record dealt with a particular decisionmaking process not yet finalized. The Defendant's presentation falls far short of that,

and its failure to pinpoint an agency decision that the May emails were made in furtherance of defeats its claim that the withheld documents are pre-decisional.[10]

*May Productions – Weekly Status Reports*

DOJ also redacted portions of Weekly Status Reports ("WSRs"), which it claims consist of discussions of ADA investigations. Def. Mem. at 11. The Berman Declaration again does not pinpoint any decisions for which these documents were generated. *See* Berman Decl. ¶ 5. And again, Defendant's Memorandum, citing the *Vaughn* index, attempts to fill in this evidentiary gap with the statement that "'Investigations were not disclosed to the public until a public action was taken such as issuing a letter of findings, entering into a settlement agreement, or filing a complaint in federal court.'" Def. Mem. at 12 (citing *Vaughn* index at 2). Thus, the decision on which Defendant appears to rely to justify its reliance on the deliberative process privilege is whether to disclose the fact of an investigation to the public after the investigation had been conducted. Def. Mem. at 12; *see also Vaughn* index at 5 ("[D]iscussion … regarding … investigation not disclosed to the public …. Redactions consist of the name of the county").

This decision identified solely in Defendant's Memorandum does not, however, line up with the withheld documents, which DOJ in its *Vaughn* index described as including material created prior to decisions on whether and how to conduct investigations. *See Vaugh* index at 6 ("Redactions consist of deliberative discussion of legal options and potential next steps related to a county that is now part of an ongoing ADA Title II voting investigation.") "Documents are 'predecisional' if they were generated before the agency's final decision on the matter," *Project*

---

[10] The *Vaughn* index specifies that one page of the record "is deliberative because this is a pre-decisional list with no decision made yet on which places to visit on the upcoming election day." *Vaughn* index at 5. While this fails to pinpoint when the decision was made, the inclusion of an actual decision in only one page emphasizes the lack of a specific decision provided for the redactions in the other 154 pages.

*on Gov't Oversight, Inc. v. U.S. Dep't of Homeland Sec.*, 657 F. Supp. 3d 50, 61 (D.D.C. 2023) (citing *Sierra Club*, 141 S. Ct. at 786), or prepared in order to assist an agency decisionmaker in arriving at his decision." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal quotations omitted). The "matter" here according to the *Vaughn* index is the agency's decisions on how to conduct its investigations, not the separate decision on whether to disclose the existence of those investigations to the public. On that decision DOJ has provided no support justifying its invocation of the deliberative process privilege. At the very least, Defendant has provided two different decisions and arbitrarily classified some documents as predecisional to one of them, and other documents as predecisional to the other, without providing a basis for that distinction or an explanation of which documents pertain to which purported decision.

Moreover, Defendant has failed to explain how discussions regarding whether to initiate an investigation are in assistance of the decision to disclose the not yet pending investigation to the public. *See, e.g., Vaughn* index at 5 ("Redactions consist of discussions in anticipation of potential challenges within a county that is now part of an ongoing ADA Title II voting investigation."). Records are only predecisional if they are "prepared in order to assist an agency decisionmaker in arriving at his decision." *Petroleum Info. Corp*, 976 F.2d at 1434. Defendant has not shown that here.

*August Productions – Emails*

For similar reasons Defendant's claim that the emails produced in the August Production fall within the deliberative process privilege also must fail. Here, too, Defendant has not shown that many of the withheld documents in fact predate an agency decision. It is not enough to claim that communications discuss a "a proposal," "a meeting," or "a phone call," because these are

19

not "agency decisions." *Climate Investigations Ctr. v.U.S. Dep't of Energy*, No. 16-cv-124 (APM), 2017 U.S. Dist. LEXIS 146246, at *32-34 (D.D.C. Sep. 11, 2017). Instead, Defendant must identify with specificity for each withheld record an agency decision that followed these communications. *Id.* Defendant's *Vaughn* index, however, fails to identify any final decisions in any of the withheld documents, let alone in each one. *See Vaughn* index at 5-13. It is neither Plaintiff's nor the Court's job to go hunting for one. *See Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009).

Defendant instead relies on catchall language to fill in this gap that lacks any evidentiary support. *See, e.g., Vaughn* index at 13 ("suggestion of points to share on an upcoming call with state officials."); *id.* at 13 ("Redactions consist of deliberative discussion of plans to communicate with state officials"); *id.* at 6 ("Email chain between CRT and AUSA attorneys discussing poll monitoring activities. Redactions consist of deliberative discussion of potential and anticipated responses to poll monitoring activities as well as potential short-term and long-term law enforcement response to challenges from states."); *id.* at 8 ("Redactions consist of a discussion of AUSA law enforcement action as well as the planned focus of CRT's investigation."). Moreover, several of the redactions refer explicitly to past decisions. *See Vaughn* index at 12-13[11] (referring to monitoring as "planned"); *id.* at 8 ("planned focus of CRT's investigation"). Similarly, in another email chain, dated 10/31/22-11/1/2022, the *Vaughn* index states, "Redactions consist of the names of poll monitors, including which component they are coming from, and polling location in NC." *Vaughn* index at 13. Again, this language indicates a decision already made.

### 2. Defendant has failed to show that the records are deliberative.

---

[11] August Production pgs. 106-09.

For information to qualify as "deliberative it "must 'reflect the personal opinions of the writer rather than the policy of the agency.'" *Morley v. CIA*, 508 F.3d at 1127 (citing *Coastal States Gas*, 617 F.2d at 866). "Factual material that does not reveal the deliberative process is not protected by this exemption." *Id.* Courts also consider "whether disclosure of a document is likely to adversely affect the purposes of the privilege," by "ask[ing] themselves whether the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency." *Coastal States Gas Corp.*, 617 F.2d at 866.

An agency seeking to invoke the deliberative process privilege must show two things: "(1) what deliberative process is involved, and (2) the role played by the documents in issue in the course of that process." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 391 F. Supp. 3d 43, 51 (D.D.C. 2019) (internal quotation marks omitted). The court should consider two other factors "in determining whether the privilege is available," specifically "the nature of the decisionmaking authority vested in the officer or person issuing the disputed document," and "the relative positions in the agency's chain of command occupied by the document's author and recipient." *Id.* (internal quotation marks omitted).

To meet these requirements here Defendant has merely provided a list of most of the individuals involved in the email communications in the May and August Productions. *See Vaughn* index at 14. But simply identifying a person's title in the agency hierarchy does not suffice. An agency seeking to withhold documents as deliberative must also identify the "nature of the decisionmaking authority vested in the officer or person issuing the disputed document," as well as the "relative positions in the agency's chain of command occupied by the document's author and recipient." *Judicial Watch, Inc. v. U.S. Dep't of Justice, 20 F.4th 49, 55 (D.C. Cir. 2021)*; *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th at 364. Here Defendant has

failed to identify the decisionmaker in any of its redactions, much less their position in the chain of command and the nature of their decisionmaking authority.

Further, the only phrase DOJ employs to describe discussions is "between CRT attorneys." *Vaughn* index at 3-5, 7-9, 11-13.[12] But the deliberative process privilege requires more than that a communication be inter- or intra-agency. A communication is only deliberative if it assists the decisionmaker in making a decision. *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 9 (D.C. Cir. 2014). Communications from the decisionmaker or communications merely stating a policy are insufficient. "A document that does nothing more than explain an existing policy cannot be considered deliberative." *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2009).

A agency also fails to meet its evidentiary burden if it merely describes the document as a whole as predecisional. "Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld." *Id.* Defendant's complete failure here to specify who made the decisions or even what position the decisionmaker occupied alone defeats its Exemption 5 claims. *See Judicial Watch*, 20 F.4th at 55. Defendant's failure to show the documents reflect the "give and take" of any decisional process only compounds its errors.

For example, for discussions of polling locations Defendant states only that "[t]he deliberative nature of these documents is underscored by the fact that the attorneys who created them are not high-level government decisionmakers." Defendant fails to answer the "who" of the decisionmaker. *See Judicial Watch*, 20 F.4th at 55. Many of the decisions regarding polling locations seem to be communicated by Elizabeth Johnson, *see e.g.,* May Production at 11, who is

---

[12] May Production pgs. 11, 18-19, 25-26, 28. August Production pgs. 3, 29, 34, 38-40, 70-71, 75, 80-81, 90, 93-97, 104-20, 123, 125-26.

a senior trial attorney in the Disability Rights Section. *See Vaughn* index at 14. This underscores the fact that it is not necessarily the "high-level government decisionmakers" who are actually making the decisions. Labelling the discussions as "deliberative" and between "CRT attorneys," *see e.g., Vaughn* index at 3-4, fails to provide a critical element of the privilege—the identity of the decisionmaker.

As to the WSRs, Defendant claims they are deliberative because "they demonstrate interim steps taken by CRT attorneys and AUSAs to obtain internal approval within DOJ to take certain actions." Def. Mem. at 12. Again, however, DOJ fails to identify who is making those decisions and the relative positions in the chain of command of the CRT attorneys and AUSAs. We are not told, for example, whether the DAAG makes all decisions in litigation that takes place in the Disability Rights Section, or whether senior trial attorneys are instead authorized to make their own decisions and, if so, which decisions. Moreover, the *Vaughn* index explicitly states that some of the information in the WSRs is provided to the DAAG for "awareness." *See Vaughn* index at 2-3; Def. Mem. at 11. Documents communicating an existing policy or final decision for purposes of giving a high-level official "awareness" fall outside Exemption 5. *Pub. Citizen*, 598 F.3d at 876.

Defendant also redacted certain documents because they are "drafts." *Vaughn* index at 5, 6, 9, 10, 13.[13] However, a draft is not *per se* exempt; the agency must still show that it is deliberative. *Judicial Watch, Inc.*, 20 F.4th at 55 (holding that documents labelled as "drafts" were not per se deliberative). Therefore, simply stating that a document "is deliberative because the attachment is a draft," *Vaughn* index at 6, fails to provide the necessary support for the invocation of the deliberative process privilege. *Id.* Further, a draft that was prepared to further

---

[13] August Production pgs. 2, 9-12, 45-50, 53-64, 110-15, 123.

an agency decision already made, rather than in preparation of a new agency policy, is not deliberative. Neither the Berman Declaration nor the *Vaughn* index provide a basis to determine whether the drafts withheld here fall into this category.

Moreover, the deliberative process privilege does not extend to facts and factual reports. *Waterman v. IRS*, 61 F.4th 152, 159 (D.C. Cir. 2023). At various points the *Vaughn* index's description of redactions makes clear they consist of facts, not deliberations. For example, the *Vaughn* index at 12 describes redactions as consisting of "a list of poll monitors, including with component they are with, planned for two counties in the state." Similarly, the *Vaughn* index describes redactions relating to "descriptions" or "identifications" of counties and methods, *see, e.g., Vaughn* index at 4 ("Redactions consist of a description of which component will be staffing a particular county"); *id.* at 3 (Redactions consist of the identification of a county), as well as names. *Id.* at 5-6, 9-11 ("Redactions consist of the name of the county").

### B. Attorney Work-Product Doctrine.

An agency relying on the attorney work-product doctrine must show that the documents were prepared in anticipation of litigation. *Senate of P.R. ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 586 (D.C. Cir. 1987). Moreover, the documents must "reflect[] the attorney's focus in a meaningful way." *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 151 (D.C. Cir. 2015). "[N]ot every item which may reveal some inkling of a lawyer's mental impressions . . . is protected as opinion work product." *Id.*; *see Director, Office of Thrift Supervision v. Vinson & Elkins*, 124 F.3d 1304, 1308 (D.C. Cir. 1997); *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1015 (1st Cir. 1998) (heightened protection is triggered only if "disclosure creates a real, nonspeculative danger of revealing the lawyer's thoughts").

Courts do not accord work-product protection to documents prepared in an agency's ordinary course of business. *Zander v. U.S. Dep't of Justice*, 885 F. Supp. 2d 1, 11 (D.D.C. 2012). In *Zander*, the court concluded that two email communications that summarized a case were not attorney work-product because they were not "prepared in anticipation of litigation," but instead were simply status reports. *Id.*

Defendant relies on the attorney work-product doctrine here to withhold "descriptions of case status [and] arguments being set forth," Def. Mem. at 7, as well as "updates detailing pending matters." *Id.* "Updates" and "descriptions" are analogous to the email communications in *Zander* that the court found were not within the scope of the attorney work-product doctrine. This Court should conclude likewise.

Defendant also redacted the "substance" of witness complaints on work-product grounds, Def. Mem. at 8, but provided no information as to whether the witnesses themselves drafted or prepared these documents. Attorney work-product only applies to documents prepared by an attorney or their agent. *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 391 F. Supp. 3d 43, 51 (D.D.C. 2019) (citing *United States v. Nobles*, 422 U.S. 225, 238-39 (1975)). It does not apply to documents provided to the government by a third-party. *See id.* (holding that law enforcement witness notes were not protected by attorney work-product, because they were not "agents" of the attorney). ADA Complaints are often unsolicited and submitted online, *see* https://www.ada.gov/file-a-complaint/, and are neither prepared by agents of the government nor prepared in anticipation of litigation. Accordingly, they would not provide any information into the attorney's mindset, which the privilege is intended to protect, only into the mindset of the witnesses. *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d at 1015 (only withheld if reveals *attorney's* mindset).

25

Finally, relying on the attorney work-product doctrine Defendant has fully redacted draft letters to county officials that "inform them of the investigation and request[] information and materials relevant to an ADA complaint." Def. Mem. at 8; *Vaughn* index at 9-10. Attorney work-product only covers material the disclosure of which "creates a real, nonspeculative danger of revealing the lawyer's thoughts." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d at 1015. Routine letters sent to inform a county of a pending investigation and request for documents do not create a "real, nonspeculative danger of revealing the lawyer's thoughts," *id.*, and therefore fall outside the protection of the attorney work-product doctrine.

**IV.      Defendant has failed to show foreseeable harm from the disclosure of the withheld records.**

"Congress adopted the [foreseeable harm requirement] in part out of concern that 'some agencies [were] overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure.'" *Reporters Comm.*, 3 F.4th at 369. "Congress was particularly concerned with increasing agency overuse and abuse of Exemption 5 and the deliberative process privilege." *Id.*; H.R. Rep. No. 391, at 9-10 ("The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse."); *see also* S. Rep. No. 4, at 3. "Congress added the distinct foreseeable harm requirement to foreclose the withholding of material unless the agency can articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Id.* "Agencies cannot rely on mere speculative or abstract fears, or fear of embarrassment to withhold information." *Id.* Nor may the government meet its burden with "generalized assertions." *Id.*

In meeting the foreseeable harm requirement, the agency must describe the foreseeable harm in a "focused and concrete" way and "in the specific context of the agency action at issue.".

*Reporters Comm.*, 3 F.4th at 370. The agency cannot rely on generalized assertions or merely state that disclosure "could . . . adversely impair internal deliberations" or chill inter-agency speech generally; it must argue that disclosure would have that effect in the relevant context. *Id.* at 369−70; *see also Ctr. for Investigative Reporting v. Dep't of the Interior*, No. 18-1599, 2020 WL 1695175, at *5 (D.D.C. Apr. 7, 2020) (concluding that agency "must show that disclosure *would* cause reasonably foreseeable harms, not that it *could* cause such harms").

The agency must also "connect[] the harms" in a "meaningful way to the information withheld, such as by providing context or insight into the specific decision-making process or deliberations at issue, and how they in particular would be harmed by disclosure." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 19-800, 2020 WL 5798442, at *4 (D.D.C. Sept. 29, 2020) (determining that agency must provide the "link between the alleged harm and the information in the withheld material"); *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (holding that agency did not satisfy the foreseeable harm requirement because it only provided general explanations and boiler plate language). Failure to identify "specific harms to the relevant protected interests" that the agency "can reasonably foresee would actually ensue from disclosure of the withheld materials" will result in disclosure. *Judicial Watch, Inc. v. DOJ*, 2019 WL 4644029, at *5.

The Berman Declaration provides virtually no support for a finding of foreseeable harm. By his own admission Mr. Berman did not review the records originating from the Disability Rights Section and can therefore provide no basis for a finding of foreseeable harm from their disclosure. Only the unsworn *Vaughn* index mentions these records in the context of the foreseeable harm requirement, but the *Vaughn* index merely echoes the Berman Declaration, and

provides little else. Accordingly, for the Disability Rights Section records, Defendant has failed to provide any factual basis to show foreseeable harm.

For the Voting Rights Section records, Mr. Berman states only that "[d]isclosing the substance of CRT's predecisional discussions would also harm CRT's ability to exercise the prosecutorial dynamic envisioned in the protections afforded to federal agencies for currently active matters as well as for the prospective law enforcement proceedings for federal voting rights work." Berman Decl. ¶ 5.[14] Mr. Berman does not explain what "prosecutorial dynamic" means in this or any other context or to which "protections afforded to federal agencies" he refers. An agency must show a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Reporters Comm.*, 3 F.4th at 370. Neither the unfocused and general explanation in the Berman Declaration nor the unsworn *Vaughn* index explains how disclosure of each of the different types of documents produced would "actually impede those agency deliberations going forward." *Id.* Mr. Berman states only in general terms that disclosure would "harm" agency deliberations but does not specify which deliberations or how. *See Reporters Comm.*, 3 F.4th at 370 (holding that generalized claims of harm are insufficient).

Further, Mr. Berman points to the agency as a "prosecutor." The withheld records, however, largely relate to DOJ's capacity as election monitor, or ADA investigator, not to its actions taken as a "prosecutor." *See Vaughn* index at 3-4 (monitor), 5-13 (investigator). Mr.

---

[14] The *Vaughn* index similarly provides that "Disclosure of the substance of CRT's predecisional discussions would also harm CRT's ability to freely exercise the kind of prosecutorial dynamic envisioned in the protections afforded to federal agencies for the currently active matters as well as for the prospective law enforcement proceedings for federal voting rights work and federal accessibility work." *Vaughn* index at 1.

Berman has not explained specifically how disclosure of any of these documents would cause a specific harm to a specific action of DOJ personnel as prosecutors.

Defendant attempts to fill in this gaping evidentiary hole with arguments in its memorandum. Def. Mem. at 13. But the mere arguments of counsel are not evidence and cannot carry the agency's burden. *See Morley*, 508 F.3d at 1127 (disregarding counsel's "post hoc explanation" that was unsupported by agency's declarations); *accord Judicial Watch*, *Inc. v. FDA*, 449 F.3d 141, 150 (D.C. Cir. 2006). Moreover, Defendant's memorandum states only that the disclosure of the records *could* cause harm. Def. Mem. at 13. This falls far short of meeting its burden to show that disclosure *would* foreseeably cause specific, articulable harm. *Reporters Comm.*, 3 F.4th at 369.

## V.    Defendant Has Failed to Meet its Burden to Demonstrate That It Properly Invoked Exemption 7

### A.  Defendant failed to show that it properly relied on Exemption 7(A).

DOJ relied on Exemption 7(A) in the May and August productions to withhold portions of Disability Rights Section memos that discussed current enforcement actions and email communications between Civil Rights Division ("CRT") employees regarding CRT monitoring efforts. *Vaughn* index 2-3. Its Exemption 7(A) claims are not well founded, however, because DOJ has failed to show there is a currently pending investigation and that the release of the withheld records would cause harm to any investigation—the burden it bears under FOIA Exemption 7(A). Most significantly, DOJ has offered no evidence that a specific investigation into the 2022 elections remains pending.

#### 1.  DOJ failed to demonstrate there is a pending law enforcement proceeding.

FOIA Exemption 7 presents a limited exemption to disclosure for "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552 b(7)(A). To successfully claim Exemption 7(A), an agency "must show that [the records] were compiled for law enforcement purposes and that their disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Gray v. U.S. Army Crim. Investigation Command*, 742 F. Supp. 2d 68, 72 (D.D.C. 2010) (*citing Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C.Cir.1993)).

While a law enforcement proceeding includes both civil and criminal matters, "a court must scrutinize with some skepticism the particular purpose claimed for disputed documents redacted under FOIA Exemption 7." *Tax Analysts v. IRS.*, 294 F.3d 71, 77 (D.C. Cir. 2002). A law enforcement proceeding must be pending for the government to withhold documents under 7(A). *Miller v. U.S. Dep't of Agric.*, 13 F.3d 260, 263 (8th Cir. 1993). Further, the government must demonstrate in terms "reasonably detailed and non-conclusory" why the investigation is still pending. *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Once an investigation or proceeding ends, the agency may no longer rely on Exemption 7(A). *See Coastal States Gas Corp.*, 617 F.2d at 870. The proceeding must be pending at the time of a court's decision, not the time of the original FOIA request. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007).

Here, DOJ has failed to demonstrate in detailed and non-conclusory terms that any specific investigation is pending or reasonably anticipated. DOJ instead offers conclusory statements that merely suggest an investigation into "whether state and local government entities that conduct voter registration and election activities are in compliance with the requirements set

forth in federal voting rights laws and accessibility laws" is ongoing. *Vaughn* index at 1. *See also* Def. Mem. at 16 ("investigations and potential litigation remain ongoing."). The Berman Declaration asserts generally that "CRT's investigations often stretch across a number of years and multiple election cycles before reaching a resolution as to whether an enforcement action is necessary." Berman Decl. ¶ 1. Mr. Berman does not, however, assert that a specific, current investigation will require investigation over multiple years and/or election cycles. DOJ makes no such statement here and identifies no actual investigation that is ongoing. The government has the burden of proving that there is a currently a pending or reasonably anticipated investigation. *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). A vague statement that generally these investigations can potentially take multiple years fails to meet that burden.

Further, the *Vaughn* index appears to go back and forth between claiming that there is an ongoing investigation, that there was an ongoing investigation, and not identifying whether the investigation is currently ongoing. *See Vaughn* index at 3 (page 11) ("Redactions include… plans to monitor a particular county that is now part of an ongoing ADA Title II voting investigation"); *id.* at 7 (page 27, 28) ("Email chain between CRT and AUSA attorneys discussing ongoing ADA Title II voting investigation"); *id.* at 1 (pages 1-5) "(The part of this report that is responsive (related to voting) is an entry under Enforcement on p. 4 seeking authority for a proposed consent decree in an ADA Title II voting violation case"). Without an adequate explanation in the Berman Declaration, there is no way of knowing if these all reference the same investigation—in which case DOJ goes back and forth between whether it is current or not—or if these are multiple separate investigations—in which case DOJ has failed to meet its burden of proving that one or more is still ongoing. This lack of clarity and detail fail to satisfy DOJ's burden of proving the existence of a currently ongoing investigation related to these records.

Defendant attempts to fill this gap by claiming in its memorandum that "these records were created prior to the election monitoring for the 2022 midterm elections, and enforcement via poll monitoring was then still pending" Def. Mem. at 16. First, this assertion is unsupported by any evidence in the record, as there is no citation to the Berman Declaration, *Vaughn* index, or any other source. Second, even if this claim were supported by evidence in the record, Exemption 7(A) requires that investigations be *currently* pending or reasonably anticipated—as in during this litigation proceeding—not at the time the records were compiled or the FOIA request was made. *Sussman v. U.S. Marshals Serv.*, 494 F.3d at 1115. DOJ has made no such showing here, failing to meet its burden that there is a pending or reasonably anticipated investigation related to these records.

### 2. DOJ failed to demonstrate the disclosure of the requested records would interfere with a pending law enforcement proceeding.

Not only must the law enforcement proceeding be pending for an agency to properly claim Exemption 7(A), but the agency also must also show "how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding." *Campbell v. Dep't of Health & Hum. Serv*s., 682 F.2d 256, 259 (D.C. Cir. 1982). It is not enough for the government to make "boilerplate, conclusory" statements that disclosure would interfere with an enforcement proceeding. *Miller v. U.S. Dep't of Agric.*, 13 F.3d 260, 263 (8th Cir. 1993). It must show there is a reasonable concern that the release of the records would impact the proceeding, such as by allowing an avenue for witness intimidation. *See N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 239 (1978). Upon review, the court must be able to "trace a rational link between the nature of the document and the alleged likely interference." *Campbell*, 682 F.2d at 265.

Here, Defendant has failed to meet its burden to show how disclosure of the requested records would interfere with a pending enforcement proceeding. DOJ offers only a throwaway line that "it was reasonably foreseeable that disclosure would harm interests protected by the specified privilege(s)." Berman Decl. at ¶ 2. The Declaration fails to identify the interests the government seeks to protect. Instead, DOJ addresses harm only in the context of the foreseeable harm requirement, offering no further explanation as to how invocation of Exemptions 5, 7(A), and 7(C) each prevent foreseeable harm. Indeed, even that showing is patently deficient as it lacks any admissible evidence to support it, relying instead on the unsworn *Vaughn* index by an unidentified author of unknown expertise.

Most significantly for Exemption 7(A), DOJ fails to provide any reasoning for why the disclosure of the requested records would harm any ongoing or anticipated enforcement proceedings. For example, DOJ regularly redacts the name of the county under investigation on Exemption 7(A) grounds, *Vaughn* index at 3, but the county already knows that it is under investigation by DOJ. Pages 48-50 of the August production consist of a letter to the county clerk informing them of the investigation of their county. *Vaughn* index at 9 (pages 48-50). It defies logic that revealing the name of the county being investigated would interfere with the investigation when that county already knows it is being investigated.

Additionally, DOJ withheld portions of weekly memoranda that describe the status of enforcement activities. *Vaughn* index at 2 (pages 1-5). However, these enforcement activities are from November of 2022 regarding the 2022 election. *Id.* That election has passed. DOJ has failed to demonstrate how an enforcement memorandum from an election that has passed would interfere with any ongoing investigation.

### B.  Defendant has failed to show that it properly relied on Exemption 7(C).

DOJ also has failed to justify its redactions in the May and August productions pursuant to Exemption 7(C). DOJ claimed Exemption 7(C) to withhold personally identifying information about local government officials, information about witnesses and informants who reported election law violations to DOJ, and the substance of the complaints the informants made. *Vaughn* index at 5-8. While Plaintiff does not contest the withholding of personally identifying information about local government officials or witnesses, DOJ has improperly withheld the substance of complaints. Specifically, DOJ has failed to demonstrate that it properly balanced the public interest in disclosure of the requested records against any privacy interests.

The FOIA allows for the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The D.C. Circuit relies on a four-step test to determine whether an agency has properly claimed Exemption 7(C): (1) whether the records were compiled for law enforcement purposes; (2) whether there is a significant privacy interest in withholding the requested records; (3) whether there is a significant public interest in disclosing the requested records; and (4) balance the privacy interest against the public interest. *CREW v. U.S. Dep't of Justice*, 746 F.3d 1082, 1091 (D.C. Cir. 2014). When balancing these interests, the court should bear in mind FOIA's "core purpose" to "shed light on an agency's performance of its statutory duties." *U.S. Dep't of Justice v. Reporters Comm.*, 489 U.S. 749, 773 (1989).

Here, what Plaintiff seeks and DOJ has withheld is the substance of witness' complaints. *Vaughn* index at 6 (Page 15), 8 (Page 37). Beyond the redaction of personally identifying information that Plaintiff does not challenge, DOJ has not demonstrated a privacy interest that would be violated if the portions of the records withheld under Exemption 7(C) were released.

The substance of complaints from witnesses does not fall within the scope of Exemption 7(C). *See Houser v. Church*, 486 F. Supp. 3d 117, 141 (D.D.C. 2020) (holding the IRS did not meet its burden in claiming Exemption 6 and 7(C) because it failed to show "why it is withholding a description of the assistance the witness provided" in addition to the personal identifying information of the witnesses). DOJ has provided no explanation for how the substance of the complaints made by unnamed and unidentifiable witnesses here would invade their privacy, the burden it bears under Exemption 7(C). In the absence of a substantial personal privacy issue Exemption 7(C) does not apply.

Further, DOJ fails to give proper weight to the significant public interest in this information. DOJ offers only the conclusory statement that "the public interest in disclosure did not outweigh the substantial privacy interest in the withheld information." Def. Mem. at 19. The government fails to identify any reasoning that supports that statement, or even what the public interest is that it purportedly weighed.

In fact, contrary to DOJ's characterization in its memorandum, election accessibility and integrity are matters of great public importance, as DOJ has acknowledged in public statements. *See* Office of Public Affairs, *Justice Department Releases Information on Efforts to Protect the Right to Vote, Prosecute Election Crimes, and Secure Elections*, U.S. Department of Justice (Jan. 9, 2024) https://www.justice.gov/opa/pr/justice-department-releases-information-efforts-protect-right-vote-prosecute-election-crimes. Whether an election runs fairly and in accordance with federal election laws affects every single person in this country. Pertinent here, the release of information showing how DOJ responded to states blocking federal election monitors from polling sites sheds critical "light on [the] agency's performance of its statutory duties." *Reporters Comm.*, 489 U.S. at 773. If people are unable to access polling places and ballots in accordance

with federal law, they are unable to participate in elections, and in turn, elections become less fair or legitimate. Thus, whether DOJ is adequately fulfilling its duty to protect federal voting rights is an issue of immense public interest that outweighs any privacy interest in the release of records.

**VI.    Defendant Has Failed to Demonstrate it Produced All Reasonably Segregable Responsive Material.**

Under the FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b*); see also Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1167 (D.C. Cir. 2011) ("[E]ven if [the] agency establishes an exemption, it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." (alteration in original) (citation omitted)). Thus, "[i]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 18 (D.D.C. 2004) (alteration in original) (quoting *Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).

Further, the agency must provide "a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." *Valfells v. CIA*, 717 F. Supp. 2d 110, 120 (D.D.C. 2010). "A blanket declaration that all facts are so intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of non-segregability[,] . . . rather, for each entry the defendant is required to specify in detail which portions of the document are disclosable and which are allegedly exempt." *Elec. Privacy Info. Ctr. v. Customs & Border Prot.*, 248 F. Supp. 3d 12, 20-21 (D.D.C. 2017). Moreover, the explanation must include a specific finding for each document withheld. *See Perry-Torres v. United States Dep't of State*, 404 F. Supp. 2d 140, 144 (D.D.C. 2005); *Animal Legal Defense*

*Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 302 (D.D.C. 1999) ("The Defendant shall not offer one finding for *all* documents.") (emphasis in original).

In short, a declaration attesting to the agency's segregation of all reasonably segregated portions of the record is required. *See Touarsi v. United States DOJ*, 78 F. Supp. 3d 332, 350 (D.D.C. 2015) (providing that "detailed declarations" reflecting that an agency "conducted a page-by-page search" satisfy the segregability requirement). Neither the Berman Declaration nor the *Vaughn* index even mention segregability, much less that the government purposefully tried to discharge its segregation burden. Certainly, they do not "specify in detail" for "each entry" whether there was any segregable material in the record.

Moreover, even Defendant's memorandum, which pays lip service to the segregability requirement, does not specify for each document the reasons for its failure to segregate for each document. *Perry-Torres*, 404 F. Supp. 2d at 144. It fails to identify which portions are withheld because they are exempt, and which portions are withheld because they are "inextricably intertwined with exempt portions." *Wilderness Soc'y*, 344 F. Supp. 2d at 18. Without knowing which records are being withheld under which basis, Plaintiff cannot properly respond and this Court cannot properly conclude DOJ met its segregation obligation. Even more problematic, the assertions in DOJ's brief concerning the government's duty to segregate lack any factual support whatsoever.

## <u>CONCLUSION</u>

For the foregoing reasons Defendant's motion for summary judgment should be denied, Plaintiff's cross-motion for summary judgment should be granted, and the challenged records or portions thereof should promptly be released to Plaintiff.

Dated: March 28, 2024                    Respectfully Submitted,

_/s/ Anne L. Weismann_
Anne L. Weismann (D.C. Bar No. 298190)
Jeffrey Gutman (D.C. Bar No. 416954)
Shalom D. Samuels (LCvR 83.4 Student-Attorney)
Anna Colaianne (LCvR 83.4 Student-Attorney)
Public Justice Advocacy Clinic
The George Washington University Law School
2000 G Street NW
Washington, DC 20052
Telephone: 202-994-5797
Fax: 202-994-3362
jgutman@law.gwu.edu
anne.weismann@law.gwu.edu

_Counsel for plaintiff_


Nikhel Sus (D.C. Bar No. 1017937)
Citizens for Responsibility and Ethics in Washington
1331 F Street NW, Suite 900
Washington, DC 20004
Telephone: (202) 408-5565
Fax: (202) 588-5020
nsus@citizensforethics.org

_Counsel for plaintiff_