**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,**<br><br>   **Plaintiff,**<br><br>      **v.**<br><br>**U.S. DEPARTMENT OF JUSTICE,**<br><br>   **Defendant.** | <br><br><br><br>**Civil Action No. 23-262 (JEB)** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Citizens for Responsibility and Ethics in Washington is a non-profit organization whose professed mission is "to empower citizens to have an influential voice in government decisions and in the government decision-making process through the dissemination of information about public officials and their actions." ECF No. 1 (Compl.), ¶ 5. In the wake of the 2022 midterm elections, it filed a Freedom of Information Act request with the U.S. Department of Justice for records concerning DOJ's efforts to send poll monitors to various jurisdictions during that election cycle — and, in particular, its response to resistance to such monitors from Missouri and Florida. Dissatisfied with the Government's sluggish response time, CREW filed this suit in early 2023. The Government has since turned over reams of responsive documents with redactions under numerous FOIA exemptions, prompting both parties to move for summary judgment on those issues. The Court will grant in part and deny in part both Motions.

1

**I.      Background**

Among the many hats DOJ's Civil Rights Division (CRT) wears is protector of access to the ballot box.  See DOJ Office of Public Affairs, <u>Justice Department to Monitor Polls in 24 States for Compliance with Federal Voting Rights Laws</u>, Nov. 7, 2022, https://perma.cc/L96T-DYML.  The division discharges that responsibility, in part, through the work of its Voting Rights Section, which enforces the civil components of federal voting laws, and its Disability Rights Section, which, through its enforcement of the Americans with Disabilities Act, "ensure[s] that persons with disabilities have a full and equal opportunity to vote."  <u>Id.</u>  In keeping with this mandate, CRT announced on November 7, 2022 — the eve of the national midterm elections — that it planned to dispatch poll monitors to 64 jurisdictions across 24 states.  <u>Id.</u>  The Secretaries of State in two of the listed states — Florida and Missouri — refused to allow such monitoring inside their polling sites.  <u>See</u> ECF No. 20 (Def. MSJ) at 2; ECF No. 23 (Pl. MSJ) at 2.  What ultimately happened there is beyond the scope of this Opinion.

Seeking to understand how Justice responded to that rebuff, CREW submitted a FOIA request to CRT on the day after the election for the following records between January 1, 2022, and the date the request was processed:

> 1.   All records relating to the deployment of DOJ personnel to monitor elections in Florida, including but not limited to any responsive communications with Florida state, county, or local officials.
>
> 2.   All records relating to the deployment of DOJ personnel to monitor elections in Missouri, including but not limited to any responsive communications with Missouri state, county, or local officials.
>
> 3.   All records relating to the deployment of DOJ personnel to monitor elections in any state (other than Florida and Missouri) that declined to authorize or otherwise objected to the presence of DOJ election monitors at or near polling places, including but

not limited to any responsive communications with state, county, or local officials.

4. All DOJ policies, procedures, guidance, memoranda, or similar records concerning the deployment of DOJ election monitors to polling places where state, county, or local officials decline to authorize or otherwise object to the presence of DOJ election monitors at or near polling places.

ECF No. 1, Exh. 1 (FOIA Request).  Later that November, Justice issued a letter acknowledging receipt of the request and assigning it a tracking number.  See Pl. MSJ at 3.  Following two more months of silence, CREW filed this action on January 30, 2023, alleging that Justice had failed to resolve its request within the statutory deadline.  See Compl., ¶¶ 17–23 (citing combined 30-day timeframe at 5 U.S.C. § 552(a)(6)(A)(i), (B)(i)–(iii)).

In lieu of immediate litigation, the parties negotiated a schedule for processing and producing responsive records.  See ECF No. 9 (Apr. 19, 2023, JSR) at 2.  DOJ identified such records in the custody of its Voting- and Disability-Rights Sections and produced them in four batches.  See Pl. MSJ at 3–4.  Only two are at issue here: the May 31, 2023, production, consisting of 29 pages of documents from the Disability Rights Section, and the August 30, 2023, production, which comprised a combined 126 additional pages from both Sections.  Id. at 4.  These productions were peppered — or blanketed, in some instances — with redactions under FOIA Exemptions 5, 6, 7(A), and 7(C)–(E).  Plaintiff does not dispute the adequacy of the search or the withholding of any personal information — including certain names, email addresses, and phone numbers — pursuant to Exemptions 6 or 7(C).  See Def. MSJ at 3–4; ECF No. 25 (Def. Reply & Opp.) at 10; ECF No. 27 (Pl. Reply) at 16 & n.3.  Nor does it contest withholdings under Exemptions 7(D) and 7(E), which involve, respectively, the identity of a confidential source, see ECF No. 20-4 (Vaughn Index) at 7–8, and certain law-enforcement techniques concerning poll monitoring.  Id. at 11, 13; see also Def. Reply & Opp. at 8 n.3.  In other words,

3

all that is at issue in the parties' now-ripe Cross-Motions for Summary Judgment are the withholdings invoking Exemptions 5, 7(A), and 7(C) to the extent that the withheld information is not in itself personally identifying.  See generally Pl. MSJ; Def. MSJ at 3–4 (citing ECF No. 19 (Joint Status Report of Jan. 3, 2024)); Pl. Reply at 16–17.

To aid in its determination, the Court on August 2, 2024, ordered the Government to submit unredacted copies of the disputed records for *in camera* review.  See Minute Order of Aug. 2, 2024.  The Court has now carefully assessed the redactions under each exemption and can decide the matter.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it can affect the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Larson v. U.S. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and internal quotation marks omitted).  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  DOJ v. Reps. Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  Summary judgment is only proper when the court is assured that the record justifies the result.  See Ctr. For Investigative Reporting v. Customs & Border Prot., 436 F. Supp. 3d 90, 100 (D.D.C. 2019).

## III.    Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted).  The statute promotes these aims by providing that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance

with published rules[,] . . . shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  The Government need not, however, turn over requested information that falls into one of nine statutorily created exemptions from FOIA's broad directive.  Id. § 552(b)(1)–(9). This Court can compel the release of any records that do not satisfy the requirements of at least one exemption.  See Reporters Comm., 489 U.S. at 755.

A "veritable avalanche of FOIA-related precedent" guides this Court's determination of whether the Government has carried its burden of establishing that a given exemption applies. Ullah v. CIA, 435 F. Supp. 3d 177, 182 (D.D.C. 2020).  Ultimately, "when an agency seeks to withhold information, it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant."  Morley v. CIA, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting King, 830 F.2d at 219).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  Larson, 565 F.3d at 862 (quoting Wolf v. CIA, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

Sensing in these requirements a shortcut to the finish line, Plaintiff argues that Justice's Motion must be summarily denied for lack of evidentiary support.  See Pl. MSJ at 6–9.  It protests that DOJ cannot rely solely on an unsworn and unattributed Vaughn Index to bolster its withholdings because a motion for summary judgment in the FOIA context must be supported by evidence meeting the requirements of Federal Rule of Civil Procedure 56(c)(4) — that is, an affidavit or declaration "made on personal knowledge" and "set[ting] out facts that would be admissible in evidence."  Id. at 7 (quoting Fed. R. Civ. P. 56(c)(4)).  It further maintains that Defendant's two accompanying declarations are a poor substitute: one merely describes the Department's search process, see ECF No. 22 (Decl. of Kilian Kagle), and the other is from a declarant who reviewed documents derived only from the Voting Rights Section, whereas the

majority of the responsive records are from the Disability Rights Section, and it is otherwise too short, generic, and conclusory.  See ECF No. 20-3 (Decl. of Robert S. Berman); see also Pl. MSJ at 7 & n.1; ECF No. 27 (Pl. Reply) at 3–5.

Whether Berman's six-paragraph declaration is insufficient to sustain any of DOJ's claimed exemptions is a judgment best made on a document-by-document and exemption-by-exemption basis.  But CREW's more significant objection regarding the Vaughn Index is worth addressing at this juncture.  Contrary to Plaintiff's assumption, see Pl. MSJ at 9, a Vaughn Index that is unsworn (as Plaintiff acknowledges they typically are, id.) can support an agency's motion for summary judgment on its own.  See Inst. for Energy Rsch. v. FERC, 2024 WL 1091791, at *2 (D.D.C. Mar. 13, 2024) (agency can demonstrate exemption applies "through the submission of an index of documents, known as a Vaughn Index, sufficiently detailed affidavits or declarations, or both") (citation omitted).  The purpose of the Index is not to serve as testimonial evidence but to "correlate statements made in the Government's refusal justification with the actual portions of the document," Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973), and thereby "give the reviewing court a reasonable basis to evaluate the claim of privilege."  ACLU v. CIA, 710 F.3d 422, 433 (D.C. Cir. 2013).  A sworn declaration is but an alternative or complementary means of discharging that function.  See Comptel v. FCC, 945 F. Supp. 2d 48, 53 (D.D.C. 2013) (listing Vaughn Index, in camera review, and declarations as potentially interchangeable and complementary tools of judicial review in FOIA cases).  The absence of one incorporating the Index does not ipso facto render the Government's Motion deficient.

The Court proceeds, then, to the withholdings.  As noted earlier, Plaintiff quarrels only with redactions under Exemptions 5, 7(A), and 7(C).  The Court addresses each of these seriatim.

A.  Exemption 5

Begin with Exemption 5, which shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The exemption authorizes agencies to withhold from a FOIA requester any "documents[] normally privileged in the civil discovery context."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984).

In addition, an agency may withhold information that falls within this or any other discretionary exemption's scope "only if . . . the agency reasonably foresees that disclosure would harm an interest" the exemption protects.  See 5 U.S.C. § 552(a)(8)(A)(i)(I).  Congress derived this requirement from an identical Department of Justice policy originally introduced in 1993 to address "concerns that some agencies [were] overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure" — particularly Exemption 5 and the deliberative-process privilege.  See S. Rep. No. 114-4, at 2–3; see also H.R. Rep. No. 114-391, at 9–10 ("[T]here is concern that agencies are overusing [FOIA's] exemptions to protect records that should be releasable under the law. . . .  The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse."); Reporters Committee for Freedom of Press v. FBI, 3 F.4th 350, 369 (D.C. Cir. 2021) (RCFP).  The requirement thus forces agencies to "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld."  RCFP, 3 F.4th at 369 (quoting H.R. Rep. No. 114-391, at 9).  They can, consequently, no longer "rely on mere speculative or abstract fears, or fear of embarrassment to withhold information.  Nor may the government meet its burden with generalized assertions."  Id. (cleaned up).

8

The only privileges contested here are deliberative process and attorney work product. The Court considers first whether either privilege applies to the pieces of information that Justice has withheld; it next examines whether DOJ has sufficiently articulated a harm that it foresees from their disclosure.

### 1.  *Deliberative-Process Privilege*

The deliberative-process privilege permits the withholding of "predecisional" and "deliberative" agency records, Access Reps. v. DOJ, 926 F.2d 1192, 1194 (D.C. Cir. 1991), to protect the free exchange of "opinions, ideas, and points of view" within an agency's operations and decisionmaking processes.  Ackerly v. Ley, 420 F.2d 1336, 1341 (D.C. Cir. 1969). "Documents are predecisional if they are generated before the adoption of an agency policy, and deliberative if they reflect the give-and-take of the consultative process."  Machado Amadis v. United States Dep't of State, 971 F.3d 364, 370 (D.C. Cir. 2020) (quoting Judicial Watch, Inc. v. U.S. Dep't of Def., 847 F.3d 735, 739 (D.C. Cir. 2017) (cleaned up)).

The records for which Justice has claimed this privilege may be sorted into three broad categories.  Within the first are weekly reports — exclusively from the May production, which totaled 29 pages — on the work of the Disability Rights Section prepared by its Deputy Chief and consisting of "litigation and investigation updates[,] . . . including descriptions of case status, assessments of the matters discussed, arguments being set forth and recommended actions." Vaughn Index at 2–3 (May pp. 1–10, 14–17).  The second consists of emails released as part of the May production, which generally involve poll-monitoring assignments and reactions to the Missouri Secretary of State's refusal to allow DOJ monitors inside the state's polling sites.  Id. at 3–4 (May pp. 11–13, 19–28).  And the third covers the entirety of the August production (126 pages), which contains email exchanges among CRT lawyers and (in some cases) with AUSAs

on a litany of other topics, including poll-monitoring plans in various jurisdictions and an ADA Title II investigation into an undisclosed county.  Id. at 5–13.  Some of the documents are withheld in full, but the majority are withheld in part.

As to the weekly reports, the basis the Government has asserted for regarding them as predecisional and deliberative is that they "are requesting or awaiting approval to initiate new or additional law enforcement activities such as lawsuits or consent decrees as well as extensions of supervision and [are] being provided to the Department for awareness and potential input."  Id. at 2.  But even if these reports predate key decisions in the matters they summarize, it seems a stretch to characterize them as "deliberative."  As is apparent from the Court's review, the summaries do not themselves "request" or "await" approval for law-enforcement activities, but simply state that such requests have been or will be made.  Nor do they opine on the merits of pursuing any particular enforcement action or intervene in any ongoing discussion with specified interlocutors.  See Jud. Watch, Inc. v. DOJ, 20 F.4th 49, 54 (D.C. Cir. 2021) (explaining that function of privilege is to foster exchange of "uninhibited opinions and recommendations"); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980) (privilege covers "subjective documents which reflect the personal opinions of the writer").  They are instead written in a largely factual and descriptive vein and addressed broadly to "CRT DRS Section" as an update on the Section's upcoming and prior "significant activities."  See ECF No. 20-5 (May Production) at 1, 6; see Fischer v. DOJ, 723 F. Supp. 2d 104, 113 (D.D.C. 2010) ("The 'deliberative' requirement renders Exemption 5 inapplicable to purely factual materials, or factual portions of otherwise deliberative documents.").  The deliberative-process privilege does not shield such information.

Justice's assertions of the privilege as to the May emails and attachments fare no better because, as Plaintiff points out, see Pl. MSJ at 12–13, 19–20, the Government has neglected to provide necessary factual context regarding these communications.  Where courts have found withheld material "deliberative," the record was clear as to "the 'who,' i.e., the roles of the document drafters and recipients and their places in the chain of command; the 'what,' i.e., the nature of the withheld content; the 'where,' i.e., the stage within the broader deliberative process in which the withheld material operates; and the 'how,' i.e., the way in which the withheld material facilitated agency deliberation."  Jud. Watch, 20 F.4th at 56.  In certain of the May emails, CRT attorneys are discussing the number of DRS and USAO staff who will monitor polling sites at various jurisdictions on election day or during early voting.  See May Production at 11, 25–26, 28.  Beyond the formal titles of the sender and recipient, however, see Vaughn Index at 14, the Court has no information as to their relative authority over which monitors to dispatch where or the specific role of their communications in that decisionmaking process.  The Vaughn Index is silent on those matters, e.g. Vaughn Index at 3 (May p. 11) (characterizing email in conclusory fashion as "[d]eliberative discussion between CRT attorneys"), and the Berman Declaration is of no use because he did not review these records, which originate from DRS.  See Berman Decl., ¶ 2.  Nor can these emails be regarded as obviously deliberative on their face, as some appear to discuss the monitor assignments as a *fait accompli*.  See May Production at 25 ("I am writing to provide you with a list of jurisdictions in which DRS and USAOs will be doing ADA monitoring . . . .") (emphasis added).

Justice's justifications for the other May emails (pp. 18, 19–24, 28) have similar problems but arguably to a worse degree.  The Vaughn Index characterizes those emails as "[d]eliberative discussion[s] between CRT attorneys about poll monitoring in [Missouri,] . . .

11

[including] potential legal issues and strategy" or simply discussions "about poll monitoring plans." Vaughn Index at 3–4. Whereas it seemed that the assignment of monitors was the decision at issue in the batch of emails just discussed, it is entirely unclear what is being decided among this set. That is in addition to the void of information as to who the deciders are and what role these particular emails play in the process. There is simply no clear basis in the Index for treating the redacted communications as predecisional or deliberative.

The asserted basis for withholding email messages and attachments from the August production raises the same problems, which the Court need not itemize. Indeed, the lack of detail as to who the ultimate decisionmakers are and how the redacted communications (and attached documents) facilitate deliberation is a consistent deficiency throughout Defendant's entire Index. And the Berman Declaration, which supplements the Index for any emails recovered from the Voting Rights Section (a subset of the August production), lends no aid — not regarding the decisionmaking authority of the Voting Rights Section *vis-à-vis* DRS, or the roles of authors and recipients of the emails, or the stage of deliberation reflected in their specific communications. See Berman Decl., ¶ 5 (stating that the records "reflect the numerous predecisional discussions among CRT attorneys that are protected by Exemption B5" and little else).

The Court also agrees with Plaintiff that the Government has not sufficiently justified its withholding under this privilege of documents within the August production that it refers to as "drafts." Pl. MSJ at 23–24 & n.13 (citing August pp. 2, 9–12, 45–50, 53–64, 110–15, 123). "[S]imply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege." Wilderness Soc. v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 14 (D.D.C. 2004). Rather, the privilege extends "only to those documents that were generated

before the adoption of an agency policy and may inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." Climate Investigations Ctr. v. U.S. Dep't of Energy, 331 F. Supp. 3d 1, 24 (D.D.C. 2018) (cleaned up). "[A] document that was 'predecisional at the time it [was] prepared," moreover, "can lose that status if it is adopted, formally or informally, as the agency position on an issue." Id. (quoting Coastal States Gas Corp., 617 F.2d at 866). Neither the Vaughn Index nor the Berman Declaration specifies whether the drafts at issue were adopted or explains in further detail the role that they played in the deliberative process. Without more, the Court cannot conclude that they are protected by the deliberative-process privilege.

All is not lost for DOJ on this point, however. For certain of the August emails, it is readily apparent from the Court's *in camera* review of the redacted information that the discussions are protected by the deliberative-process privilege (the flaws of the Vaughn Index and declaration notwithstanding). These are conversations regarding (1) how to proceed in an ADA Title II investigation into an undisclosed county, including whether to initiate one, which DOJ office should handle it, whether to retain an expert (and which one), what questions to include in an election-monitoring form for that county, what questions to ask a confidential informant, and whether and how the investigation should be closed (August pp. 13–14, 27–28, 38–41, 47, 51–52, 60, 65, 69); (2) how to respond to press inquiries regarding states' refusals to allow DOJ monitors inside their polling sites (August pp. 70–71, 75, 90, 93); and (3) how to communicate with certain local and state election officials in preparation for poll monitoring in their states or respond to their refusals of entry (August pp. 7, 29, 80–81, 93–94, 104–15, 118–20, 123).

Internal discussions within an agency regarding how to respond to public authorities and inquiries from the public are often deemed to be protected by the deliberative-process privilege. See Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs., 698 F. Supp. 3d 82, 126 (D.D.C. 2023); Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau, 60 F. Supp. 3d 1, 10 (D.D.C. 2014) ("Internal communications regarding how to respond to media and Congressional inquiries have repeatedly been held to be protected under the deliberative process privilege."). And the foregoing emails clearly show Department attorneys expressing views and "weighing the pros and cons" of possible responses. Coastal States Gas Corp., 617 F.2d at 866. The email discussions concerning key investigative decisions and proposed next steps also reflect the kind of "brainstorming," "suggestions," "opinions," and "preliminary conclusions" at the core of what the privilege protects. See, e.g., In re Anthem, Inc. Data Breach Litig., 236 F. Supp. 3d 150, 164 (D.D.C. 2017).

### 2.  *Attorney Work-Product Privilege*

Justice has also claimed the attorney work-product privilege as to several responsive records. The privilege "shields materials prepared in anticipation of litigation," McKinley v. Bd. of Governors of the Fed. Reserve Sys., 647 F.3d 331, 341 (D.C. Cir. 2011) (cleaned up), to protect from disclosure the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning litigation." Heggestad v. DOJ, 182 F. Supp. 2d 1, 7 (D.D.C. 2000). A document falls within the scope of this privilege if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998) (citation omitted). The authoring attorney must

"have had a subjective belief that litigation was a real possibility" and the belief must have been "objectively reasonable."  Id.

Importantly, the work-product privilege does not cover "any document prepared by any person in the Government with a law degree simply because litigation might someday occur" or else "the policies of the FOIA would be largely defeated."  Coastal States Gas Corp., 617 F.2d at 865.  Rather, a reviewing court must apply the "because of test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  United States v. Deloitte LLP, 610 F.3d 129, 137 (D.C. Cir. 2010) (cleaned up) (emphasis added).

CREW contests only a few specific invocations of the privilege here.  The Court will address them one by one, treating the others not mentioned as conceded.  First are "descriptions of case status [and] argument being set forth," which presumably refer to the May weekly reports.  See Pl. MSJ at 25.  Certain portions of those reports appear to satisfy the "because of" test.  The reports were prepared by the Deputy Chief of the Disability Rights Section — a lawyer.  Vaughn Index at 2, 14.  According to the Index, the only portions redacted as work product are "those where the report consist[s] of evidence or results of investigations, site visits or interviews shared as part of a request or recommendation for legal action."  Id. at 2.  Necessarily, any such entry would have been created "because of" anticipated legal action.  See SafeCard Servs., 926 F.2d at 1203 ("[W]here an attorney prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to qualify as attorney work product.").

Zander v. DOJ, 885 F. Supp. 2d 1 (D.D.C. 2012), does not counsel a different conclusion. Contra Pl. MSJ at 25.  Summaries shared among government lawyers of an investigation that they anticipate will ripen into legal action — such as the redacted content in the weekly reports — are a far cry from emails to a client summarizing a case in layman's terms (which were deemed not to be work product in that case).  Cf. Zander, 885 F. Supp. 2d at 11.  The latter communication is purely for the recipient's edification, while the former serves to inform the very attorneys who may authorize or carry out the litigation.

Plaintiff next disputes whether the "substance" of witness complaints, which the Government has redacted, qualifies as work product because the Government does not specify whether they were prepared by an attorney or the witness himself.  See Pl. MSJ at 25.  The Government's defense is that the records Plaintiff is referring to are actually "emails amongst attorneys describing a witness complaint, and legal assessments thereof, not the complaint itself."  Def. Reply & Opp. at 7 (citing August pp. 13–14).  The Court's review of these records confirms that the Government is correct.

The last of Plaintiff's objections is that DOJ has improperly "redacted draft letters to county officials that 'inform them of the investigation and request[] information and materials relevant to an ADA Complaint."  Pl. MSJ at 26 (citing Def. MSJ at 8 & Vaughn Index at 9–10).  Such letters, CREW contends, are "[r]outine" and thus pose little risk of "revealing the lawyer's thoughts."  Id. (citing In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1015 (1st Cir. 1988), for proposition that privilege only protects material that "creates a real, nonspeculative danger of revealing the lawyer's thoughts.").  But In re San Juan referred to the standard for a document to qualify as opinion (as opposed to ordinary) work product, which is

subject to "heightened protection."  859 F.2d at 1015.  The at-issue records need not meet that standard to be exempt from disclosure under Exemption 5.

Applying the usual standard, the Court agrees with the Government that the records are privileged.

### 3.  *Foreseeable Harm*

The Government faces a final stumbling block, however: even though the Court has upheld certain of its privilege assertions, the statements in its <u>Vaughn</u> Index and declarations, standing alone, still flunk the foreseeable-harm requirement.  <u>See</u> Pl. MSJ at 26–29.  As noted earlier, that standard dictates that an agency invoking an exemption must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect [such] harms in a meaningful way to the information withheld."  <u>Ctr. for Investigative Reporting</u>, 436 F. Supp. 3d at 106 (cleaned up).  In the context of the deliberative-process privilege, particularly, this means that the agency must provide a "focused and concrete demonstration of <u>why</u> disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward."  <u>RCFP</u>, 3 F.4th at 370 (emphasis added).

Despite having claimed privilege for nearly every record listed in the <u>Vaughn</u> Index — a wide and varied range of materials — Justice's articulation of the harm from disclosure of any of these records is a single sentence.  Such disclosure, it avers, would "harm CRT's ability to freely exercise the kind of prosecutorial dynamic envisioned in the protections afforded to federal agencies for the currently active matters as well as for the prospective law enforcement proceedings for federal voting rights work and federal accessibility work."  <u>Vaughn</u> Index at 1; Berman Decl., ¶ 5 (same); <u>see also</u> Def. MSJ at 8–9, 12–13 (relying on Index and Declaration).

This is precisely the kind of boilerplate recitation, untethered to the content of any particular

document or category of documents, that our Circuit and courts in this district have deemed

insufficient to show foreseeable harm.  See, e.g., RCFP, 3 F.4th at 372 (rejecting "perfunctory,

sweeping, and undifferentiated declaration that release of every single record withheld would

have an 'inhibiting effect' by 'chill[ing] full and frank discussions'"); Americans for Fair

Treatment v. U.S. Postal Serv., 663 F. Supp. 3d 39, 59 (D.D.C. 2023) (rejecting as "boilerplate"

the assertion that disclosure of withheld communications would "constrain the day-to-day

discussions amongst Postal Service staff who would . . . feel inhibited from effectively

communicating with one another"); see also Colo. Wild Pub. Lands v. U.S. Forest Serv., 691 F.

Supp. 3d 149, 165 (D.D.C. Sep. 11, 2023) (similar); Jud. Watch, Inc. v. DOJ, 2019 WL 4644029,

at *5 (D.D.C. Sept. 24, 2019) (similar).  The Government, consequently, has not carried its

burden of establishing a harm that would follow from the disclosure of its Exemption 5

withholdings.

        This deficiency would seem fatal to the Government's Exemption 5 withholdings across

the board.  Courts have, however, accepted a less detailed explanation of foreseeable harm when

the sensitivity of the withheld information is obvious in context.  See RCFP, 3 F.4th at 372

(finding "foreseeability of harm manifest" from "[t]he very context and purpose" of

communications among "Director [James] Comey and high-ranking FBI officials about how to

respond to an ongoing crisis that threatened existing covert Bureau operational tactics").  Only

with the benefit of *in camera* review — which the Government cannot count on in every case

and, in fact, often opposes in principle — does the Court find that the withheld pieces of

information that it previously concluded are clearly covered by the deliberative process privilege,

see *supra* Part III.A.1, also meet the foreseeable-harm requirement based on their context and

purpose.  The decision of when and how to open investigations, whether and how to respond to inquiries by the news media, and how to communicate with local officials about enforcement plans in their jurisdictions and what legal authority to invoke, seem central to CRT's law-enforcement duties.  Cf. Rosenberg v. U.S. Dep't of Def., 442 F. Supp. 3d 240, 259 (D.D.C. 2020) (drawing distinction between "obviously sensitive" deliberations and deliberations on "mundane, quotidian matters").  And the routine disclosure of opinions on those matters would likely have a chilling effect on future deliberations.

Certain of the records withheld under the work-product privilege (and that the Court has not already concluded are shielded by the deliberative-process privilege) would also clearly meet the foreseeable-harm requirement when considered in context.  These are (1) a discussion of civil-rights violations and the legal basis for potential next steps in an investigation into a county (August p. 8); (2) draft election-monitoring forms, which DOJ monitors use to record their observations (August pp. 10–12, 57–59, 62–64); and (3) a draft list of questions to ask a complainant in an interview with DOJ attorneys (August pp. 45–46).  Given the role of these records in the Department's investigative process, it seems obvious that their disclosure would deprive its attorneys of the "privacy" necessary to "sift what [they] consider[] to be the relevant from the irrelevant facts, prepare [their] legal theories and plan [their] strategy." Hickman v. Taylor, 329 U.S. 495, 510–11 (1947).  The Court has no qualms about concluding that such disclosure may indeed result in the chilling effect the privilege serves to prevent.  See, e.g., Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec., 2022 WL 1081097, at *5–6 (D.D.C. Apr. 11, 2022) (assertion that disclosure of immigration trial attorney's notes would "chill or deter [agency] employees from engaging in candid and frank discussions" too "boilerplate," but "context and purpose" of notes make the harm "self-evident") (cleaned up).

\*      \*      \*

To sum up: the Court concludes that the Government may continue to withhold all information redacted pursuant to the deliberative-process privilege on pages 7, 13–14, 27–28, 29, 38–41, 47, 51–52, 60, 65, 69, 70–71, 75, 80–81, 90, 93–94, 104–15, 118–20, and 123 of the August production, and all information redacted pursuant to the attorney work-product privilege on pages 8, 10–12, 45–46, 57–59, and 62–64 of the August production.

B.  Exemption 7(A)

Justice has also cited Exemption 7(A) as a basis for many of its redactions, which substantially overlap with the Exemption 5 ones.  The former exemption permits an agency to withhold "records or information compiled for law enforcement purposes" when production of such records "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  To prevail under this exemption, the Government must "demonstrate that disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated."  Citizens for Resp. & Ethics in Washington v. DOJ, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (citation omitted).  Although courts "give deference to an agency's predictive judgment of the harm that will result from the disclosure of information," id. at 1098, the Government cannot meet its burden "simply by demonstrating that the withheld information was clearly related to (an ongoing investigation)."  Campbell v. Dep't of Health & Hum. Servs., 682 F.2d 256, 259 (D.C. Cir. 1982) (citation omitted).  Rather, it "must show, by more than conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding."  Id. (emphasis added).

Plaintiff does not contest that the withheld materials were compiled for law-enforcement purposes, but it doubts that they relate to any pending law-enforcement proceedings or would

20

interfere with them if released.  See Pl. MSJ at 29.  To facilitate its analysis of those issues, the Court will sort the Exemption 7(A) withholdings into three categories: (1) DRS's weekly reports (May pp. 1–10, 14–17); (2) email exchanges and attachments concerning poll monitoring, some in connection with an ADA Title II voting investigation and some not (May p. 11 and August pp. 2–5, 7–8, 9–12, 29, 80–81, 90, 94–97, 104–120, 123–26); and (3) email exchanges and attachments purely concerning ADA Title II voting investigations (May p. 18 and August pp. 13–28, 30–47, 51–52, 56, 60–61, 65–69).

For each of these sets of records, it is unclear, based on the Court's review of the materials themselves and the Government's evidentiary submissions, that they relate to ongoing or anticipated investigations.  The weekly reports, to start, clearly summarize updates in investigations being handled by DRS.  See Vaughn Index at 1–2.  But they were issued in November 2022, and the Index does not state explicitly that the matters they summarize are currently ongoing.  Id.; see also CREW, 746 F.3d at 1098 (expressing doubt as to "whether a criminal investigation in fact continues to this day," in part because "[i]t ha[d] been over 30 months since DOJ filed its Declaration" describing them as ongoing and "many more since the events underlying the investigation took place").  The Court cannot credit DOJ's unattributed assertion in its briefing that they are ongoing.  See Def. MSJ at 16; Comptel v. FCC, 945 F. Supp. 2d 48, 60 (D.D.C. 2013) ("The Court cannot base its decision on statements included only in the FCC's Opposition, rather than in the agency's Declaration or Vaughn Index.").

As to the emails concerning ADA Title II voting investigations (but not poll monitoring), the bulk of them relate to a specific investigation into an undisclosed county.  See, e.g., Vaughn Index at 5 (August p. 1).  The Index describes that investigation as ongoing.  There is, however, some indication in the unredacted materials submitted in camera that the Department was

preparing to close it.  See ECF No. 20–6 (August Production) at 27–28.  And the remainder are simply described as ongoing without further detail.  Although that representation does not seem to be contradicted by other evidence in the record, it is insufficient on its own to support a withholding under Exemption 7(A).  See CREW, 746 F.3d at 1097–98 (agency must show withheld record "relates to a concrete prospective law enforcement proceeding," and "vague" mention of "ongoing investigations" leaves court with uncertainty) (cleaned up); Majuc v. DOJ, 2019 WL 4394843, at *2 (D.D.C. Sept. 13, 2019) ("Vague mentions of ongoing proceedings are not enough to support Exemption 7(A).").

As to the emails concerning poll monitoring, evidence connecting them to pending or anticipated proceedings is also lacking.  For many of them, the Vaughn Index does not even represent that they relate to such proceedings.  See, e.g., Vaughn Index at 11–13 (August pp. 80–81, 94–97, 104–26).  For the others, the Index only states in conclusory fashion that a relevant investigation is ongoing.  See, e.g., id. at 12 (August p. 90).  This proffer is simply insufficient for the Court to conclude with certainty that Exemption 7(A) applies.

The Government's deficiencies are compounded by the frequent lack of information in the Index as to whether disclosure of each withheld item would cause interference with a law-enforcement proceeding.  Our Circuit, to be sure, has made it clear that the Government "need not proceed on a document-by-document basis, detailing to the court the interference that would result from the disclosure of each of them," but "may take a generic approach, grouping documents into relevant categories."  Bevis v. Dep't of State, 801 F.2d 1386, 1389 (D.C. Cir. 1986).  But if it pursues the latter route, it must (1) "define its categories functionally"; (2) "conduct a document-by-document review in order to assign documents to the proper category"; and (3) "explain to the court how the release of each category would interfere with enforcement

proceedings." Id. at 1389–90.  Here, it seems that the Government has taken neither avenue —
instead offering some potentially valid theories of interference without tying them to specific
redactions or appropriately defined categories in accordance with the foregoing three-step
procedure, see Def. MSJ at 16–17, and offering blanket and conclusory statements falling far
short of its burden.  See Berman Decl., ¶ 4.

Given this lack of detail, the Court cannot conclude that any of DOJ's withholdings are
protected under Exemption 7(A).

C.  Exemption 7(C)

The last item on the chopping block is Exemption 7(C), which excludes from disclosure
"records or information compiled for law enforcement purposes . . . to the extent that the
production of such law enforcement records or information . . . could reasonably be expected to
constitute an unwarranted invasion of personal privacy."  Id. § 552(b)(7)(C).  This provision
requires reviewing courts to "balance the privacy interests that would be compromised by
disclosure against the public interest in release of the requested information."  Beck v. DOJ, 997
F.2d 1489, 1491 (D.C. Cir. 1993) (quoting Davis v. DOJ, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

As noted earlier, application of this exemption is largely undisputed because DOJ has
clarified that only names and personal information were redacted under it.  Plaintiff, however,
continues to oppose the redaction of certain details that it does not consider personally
identifying — namely, the polling locations and counties of complainants.  See Pl. Reply at 16
(citing August pp. 37, 65, 66–68).  The Court agrees that redacting names, phone numbers,
addresses, and other identifying details substantially diminishes the privacy interest associated
with a complainant's polling location and county.  Cf. Matter of Search of Info. that is Stored at
Premises Controlled by Google LLC, 579 F. Supp. 3d 62, 89 n.26 (D.D.C. 2021) (noting that

"disclosure of anonymized location information . . . does not implicate significant privacy

concerns").  When weighed against the legitimate public interest in learning the "specific

counties or polling locations that experienced concerns significant enough to generate a

complaint and DOJ's response," Pl. Reply at 16, Exemption 7(C) poses no barrier to disclosure.

*     *     *

In short, DOJ has met its burden — at least given CREW's concessions — to justify

certain of its withholdings under Exemptions 5, 6, 7(C) (except as to polling locations and

counties), 7(D), and 7(E).  It has, conversely, failed entirely to justify its Exemption 7(A)

withholdings.  In light of the importance of that exemption here, however, and in the hope of

avoiding undue interference with any ongoing investigations, the Court will allow the

Government another opportunity to explain why it applies as broadly as claimed.  The only

records the Court shall order released at this juncture are those that Exemption 5 does not protect

(either because no privilege applies or because a showing of foreseeable harm is lacking) and for

which no other exemption has been claimed.  In other words, apart from pages 25–28 of the May

production and pages 53–55 of the August production, the Court will not order any records

released immediately.

If the Government believes that it can better support Exemption 7(A) withholdings, it

must obtain a supplemental declaration confirming that the investigations referred to in the

Vaughn Index are still ongoing or anticipated and explain in greater detail how the production of

the redacted information would interfere with them.  Any sensitive details may be submitted *in

camera* if need be.  See Perioperative Services and Logistics, LLC v. U.S. Dep't of Veterans

Affairs, 57 F.4th 1061, 1065 (D.C. Cir. 2023) (*ex parte* affidavit appropriate "if and only if (1)

the validity of the government's assertion of exemption cannot be evaluated without information

24

beyond that contained in the public affidavits and in the records themselves, and (2) public disclosure of that information would compromise the secrecy asserted") (cleaned up).  The parties may then move once more for summary judgment.  Upon resolving that forthcoming motion, the Court will address the parties' arguments regarding segregability, if necessary.

## IV.    Conclusion

For the foregoing reasons, the Court will grant in part and deny in part both parties' Motions for Summary Judgment.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  August 19, 2024